THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVE SHORE, Defendant-Appellant.

First District (5th Division)   No. 83—0921

Opinion filed December 7, 1984.

446

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Andrea D. Lyon, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Timothy J. Joyce, and Patrick J. Foley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a bench trial, defendant was convicted of felony murder and sentenced to a term of 35 years. On appeal, he contends that (1) he was not proved guilty beyond a reasonable doubt; and (2) the trial court (a) improperly considered matters not in evidence in reaching its verdict, (b) abused its discretion in denying his post-trial motion to reopen the case, and (c) denied him a fair trial by shifting the burden of proof to him.

At trial, David "Bo" Burns (Burns) testified that he, Willie Adams (Adams), Chester Bland (Bland), Andrew Shaffer (Shaffer), and defendant were drinking beer and wine and smoking marijuana in front of an apartment building at 4014 South Drexel Avenue in Chicago at about 7 or 8 p.m. on August 10, 1982. An argument started between Adams and defendant and, when Adams said that he did not have a gun, defendant said, "Sucker, I got mine," and then drew a gun and stuck it in Adams' chest. At that point, Myra Sexton (Sex-

ton), who was watching from the window of her apartment, called defendant inside the building, and after he came out the men went to the liquor store to purchase more beer and wine, thereafter returning to the front of the apartment building to drink it. At about 12:15 a.m., the victim—a security guard—walked past them on the opposite side of Drexel Avenue near the El Rukn headquarters, and upon seeing him, defendant said, "I am fitting to get this chump," and then ran across the street with his gun in his hand. As the victim turned, defendant shot him twice in the chest and then took his service revolver. Defendant then ran back across the street, carrying the revolver, and as he passed he said, "I got this chump."

At about 7 a.m. the following morning, defendant came to Shaffer's house where he (Burns) and Bland had spent the night, and when Shaffer asked defendant, "Man, what did you do?" he responded, "Man, I believe I killed this chump." Defendant also told them that he threw the victim's revolver into a red container and hid the murder weapon under some wood. After accompanying defendant to an area where he said the police had chased him, he (Burns), Bland, and Shaffer returned to Shaffer's house, but defendant remained to search for the weapons. Later that day, defendant returned to Shaffer's house with a .38-caliber revolver, opened it, removed two spent cartridges, flushed them down the toilet, and left. Several days later, when Burns learned the police were looking for him, he arranged to meet them in a lounge. Three officers took him to a police station, where one officer told him that defendant, who was also in custody, had named him as the killer. He then told the police what he observed on the night of the shooting. He had not contacted the police immediately, because in 1974 he was framed for a murder he did not commit and ultimately pleaded guilty to robbery in order to get out of jail, and he did not want to get involved with the police again. Burns also admitted to a conviction for possession of marijuana and that he was formerly a "foot soldier" in the El Rukn street gang. On cross-examination, he stated that while he was in custody, the police said that defendant tried to "give the case" to him and that they were going to charge him with this murder. He told the police that Shaffer, also known as "Rab," was present on the night of the shooting; that immediately afterwards, defendant said, "I just got this chump"; and that they searched for the guns the next morning, but that he did not tell them what had occurred at Shaffer's house or about the statements made there by defendant. He admitted that he had been afraid he would be charged for the crime, but he denied threatening defendant's family, stating that he remained downstairs

when he and Shaffer went to defendant's apartment building to tell his mother they did not want to see defendant go to jail.

Bland, also a former El Rukn "foot soldier," testified to essentially the same version of events as did Burns, although he did not hear defendant say anything as he ran past after shooting the victim. He admitted on questioning by defendant's attorney that she and another person came to his house to question him about the shooting, but he told them he did not want to say anything before consulting with his attorney. He did not say that he would not tell them what really happened on the night of the murder because he was afraid that if he told the truth he would be charged with perjury. Several days after the shooting, he was taken to Area 1 headquarters, but the police did not tell him they believed he was involved in the murder or that he might be charged with it; neither did he think he would be charged. Although he told the police what occurred on the night of the shooting, he did not tell them that Shaffer had been present throughout the evening, and he did not tell them—nor did they ask— anything concerning the events of the following day. He did not initially contact the police because he did not want to become involved, and he acknowledged that he could have been prosecuted for contempt had he failed to comply with a subpoena he received to appear as a witness. Following Bland's testimony, the trial court granted the State's motion to withdraw the petitions for contempt citations against Burns and Bland, since both witnesses had voluntarily complied with the subpoena to testify.

Myra Sexton then testified that she was in front of her apartment building on the night in question with Shaffer, Burns, Bland, Adams, and defendant when the latter two began arguing about a television. She went inside her apartment and, as she watched from a window, she saw defendant draw a gun and point it at Adams. She called defendant upstairs and asked him to leave his gun with her and go "cool out" somewhere, but he left, taking the gun with him. She then closed her window, remained in her apartment, and did not see defendant again that night. She was a good friend of Burns and Bland and acknowledged discussing the shooting incident with them before she was taken to the police station, where she was interviewed for about seven hours. She also knows several members of the El Rukn street gang, but she was not a member of the women's division thereof.

Paulette Jones, a 17-year-old high school student, testified that in late August 1982, she and some friends were behind the "old folks home" across the alley from her father's church when one of the boys

saw a gun lying next to some trash cans. They flagged down an unmarked police car, whose occupants retrieved the gun. It was stipulated that, if called, Officer Lipinski would testify that he was stopped by Paulette Jones and her friends and directed to a red container next to a senior citizens' home, where he found a .357-caliber Smith and Wesson revolver. The gun was registered to the victim, but it was not the weapon used to kill him.

Ernest Wells testified for the defense that shortly after midnight on August 10, 1982, he was driving southbound on Drexel Avenue when he heard gunfire, turned, and saw a man on the opposite side of the street standing over and pointing a gun at another man, who was lying on the sidewalk. The gunman fired a second shot at the victim, bent down, removed something from the victim's pocket, and then walked south toward 40th Street, where he crossed Drexel Avenue and was joined by another man, with whom he then ran away. He (Wells) made a U-turn, drove back to where the victim was lying, and when the police arrived he described the gunman as 18 or 19 years old, 140 to 150 pounds, five feet eight inches or five feet nine inches tall, with short hair and a "dark tan" complexion which was approximately the same as, or a little darker than, that of his girlfriend, whom he pointed out in the courtroom. Later, during arguments, the trial court specifically noted that "the defendant's complexion was very close to that lady *** there was not much difference." A few days later, he viewed a lineup but did not identify any of the participants. He did not know defendant, and stated when viewing defendant in the courtroom that he had never seen him before. In response to questions by the court, Wells also stated that his observation of the gunman was for about five minutes from a distance of 200 feet, and that he did not want to get closer because the man had a gun. He also stated that it was dark outside and that, although the streetlights were on, he could see only the man's right profile.

Karen Shore, defendant's 16-year-old sister, testified that she was at home on the afternoon of December 1, 1982, when she heard a knock on the door. Her younger sister, Laydia, opened the door to two men whose names she subsequently learned were "Rab" and "Bo." The men asked Laydia if her mother or sisters were home, and when Laydia said, "No," she (Karen) ran to the door and slammed it. She then heard "Rab" say, "Tell your brother he just better not tell anything. I'll kill all you _____", whereupon her other sister, Phyllis, called the police. She stated that she knew "Rab" and "Bo" by sight but had never seen them with her brother, and she did not know their real names or what they were talking about until her

mother told her later that they were going to be witnesses against defendant. Laydia Shore, defendant's 15-year-old sister, testified that when Karen slammed the door, she (Laydia) ran toward the back of the house and did not hear the men, whose names she too learned from her mother, say anything else.

The parties stipulated that defendant was 20 years old, six feet tall, and weighed 175 pounds; that Ernest Wells viewed a lineup in which defendant appeared but did not make an identification; that there was nothing in the police reports indicating that Burns told them that Shaffer was present on the night of the shooting or that defendant said, "I shot the chump," or that there was a search for the guns the following day. Certified copies of Burns' 1971 and 1975 convictions for disorderly conduct and criminal damage to property were admitted into evidence.

Drew Sosnowski, a former student intern at the public defender's office, testified that he was present on September 1, 1982, when Bland told defense counsel that what he told the police did not really happen and that he was afraid that if he told the truth he would be charged with perjury. Bland then refused to answer any additional questions before speaking to his attorney.

Defendant was found guilty of felony murder on January 6, 1983, and the case was continued until February 28, for post-trial motions and sentencing. On that date, defendant filed a motion to reopen the case for admission of evidence not presented at trial. At the hearing on the motion, defense counsel made an offer of proof as to the evidence sought to be admitted, during which Robert Lee Clark testified that on the night of August 10, 1982, after being together practically all day, he and defendant were riding their bicycles southbound on Drexel Avenue on their way home from the lake when he heard two shots and saw a man, whom he did not recognize, running across the street carrying a gun. The man hollered to a second person, and both men, neither of whom he knew or could describe, ran toward the housing project; he and defendant continued on to the apartment building where they lived. Although he learned about defendant's arrest the day after it occurred, he never told the police what he saw because he "knew what those studs would do" and he first told defense counsel what he knew "sometime around Christmas." Clark admitted that he had a juvenile conviction for auto theft and that he had known defendant for four or five years.

Defendant then testified on the offer of proof that shortly after midnight on August 10, 1982, he and Clark were riding their bicycles southbound on Drexel Avenue when he heard a shot followed by a

pause and a second shot. He turned and saw a man, whom he recognized as David Burns, running across the street carrying a large silver object in his hand. Burns met up with a second man, and they both turned and pointed toward him (defendant). A "fat lady" carrying a baby then approached Burns and the other man, and it appeared that they "exchanged something" with her before running toward the housing project. He was not a gang member and did not own a gun or have an argument with Willie Adams. He had not been with Burns, Bland, and Sexton on the night of the shooting nor at Shaffer's house the following day. When arrested, he was afraid to tell the police what he knew, because the day after the shooting two men in a lounge asked him if he saw anything and, when he told them he had not, they said that if he did or if he said anything about what he saw, he would find himself in the morgue. On cross-examination, defendant denied telling the police that he had been home in bed on the night of the shooting, stating that he told them he had a tooth pulled and had stayed in bed during the day but that he went out with Clark that night. He also stated that although defense counsel represented him since shortly after his arrest, he did not tell her what he saw "until after the trial began" because of the threat he received and because he "just wanted to go ahead and let it all be over with and leave it alone." In response to questions by the court, defendant stated that everything Burns, Bland, and Sexton had testified to was untrue.

It was then stipulated that if called, Detectives Kerstein and Van-Bershott would testify that while in custody defendant told them that he arrived home from having a tooth pulled at about 5:30 p.m. on the day in question and that he stayed in bed the remainder of that night and the following morning. After arguments by counsel, the trial court denied defendant's motion to reopen the case, and this appeal followed.

OPINION

Defendant first contends that he was not proved guilty beyond a reasonable doubt. Setting out numerous allegations of evidentiary deficiencies in chart form in his brief, defendant essentially maintains that his conviction should be reversed because (1) the two State witnesses who provided the only direct evidence of his involvement in this crime were not credible for the reason that (a) as former suspects themselves, they had motive to implicate him and to thereafter testify falsely, and (b) their testimony was contradicted and impeached; and (2) that the trial court's findings were unsupported by the record.

■ It is well settled that in a bench trial it is the function of the

trial court, as the trier of fact, to determine the credibility of the witnesses and the weight to be accorded their testimony, to resolve inconsistencies and conflicts therein, and to render its decision accordingly (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64), and a reviewing court will not substitute its judgment for that of the trial court on these matters, nor will we reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt of defendant's guilt (*People v. Kline* (1982), 92 Ill. 2d 490, 442 N.E.2d 154).

■■ In support of his contention that Burns and Bland both had motive to implicate him in the murder and thereafter testify falsely, defendant first asserts that Burns admitted naming defendant as the murderer after being told by police that he "would get this case" unless he named defendant, and that Bland "nearly admitted" the same. Initially, we note that the statement defendant attributes to Burns is not a wholly accurate representation of that elicited by defense counsel on cross-examination, during which the following colloquy occurred:

"Q. When you were in the police station, the police had you in their custody, didn't they?

\* \* \*

A. Yes, I was in custody.

Q. In fact, they told you they were going to give the case to you if you did not name Steve Shore, didn't they?

A. They told me—

Q. Answer my question, Mr. Burns, please, yes or no?

\* \* \*

A. They said Steve Shore tried to give the case to me.

Q. Answer the question, Bo.

[Assistant State's Attorney]: Objection, he did answer.

[Defense counsel]: It calls for a yes or no.

THE COURT: It can be answered yes or no. They told you they were going to give the case to you? Can you answer that yes or no? Is that what the police told you?

A. Yes."

When read in context, it is apparent that Burns, responding to counsel's inquiry as to whether his release from custody was conditioned upon his specifically naming defendant as the murderer, initially answered that the police told him that "Steve Shore tried to give the case to me." The question to which Burns ultimately gave a positive response was the more narrow one posed by the court, *i.e.,* whether

the police threatened to charge him with this offense. Similarly, with respect to defendant's assertion that Bland "nearly admitted" that his implication of defendant was induced by a fear that he would be charged, we note that Bland said the police never told him they thought he was involved or might be charged with this crime, nor did he think that he would be charged. Moreover, although the fact that a witness was previously arrested and/or charged with the same crime might raise an inference that his testimony was influenced by pressures from law enforcement authorities sufficient to affect his credibility (see *People v. Green* (1983), 118 Ill. App. 3d 227, 454 N.E.2d 792), we note again that determinations concerning the credibility of witnesses and the weight to be given their testimony are matters for the trier of fact. Here, the fact that Burns and Bland had both been in custody and questioned and that Burns feared he might be charged with this murder were matters brought out on cross-examination and vigorously argued by defense counsel as indicia of their bias and lack of credibility. Nevertheless, the trial court found their accounts of the shooting to be credible and, because it had the opportunity to hear their testimony and observe their demeanor, we see no reason to substitute our judgment therefor. *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64.

■ Neither do we see any merit in defendant's contention that bias of Burns and Bland was established because they were members of the El Rukns, whose headquarters were only a block from the scene. Solely on the basis of this membership, defendant argues "these El Rukns managed to fool the police. They fooled Judge Heyda. They framed Steve Shore because they needed to put him out of the picture." Thus, defendant theorized that as El Rukns, Burns and Bland conspired to frame him, a concept rejected by the trial court but apparently adopted in the dissenting opinion here. We also reject it for a number of reasons, some of which will be discussed in more detail below.

First, there is nothing in the record refuting the testimony of Burns and Bland concerning the fact that they had disassociated themselves from the El Rukns. Second, the record does not disclose or explain the relationship between El Rukn membership and possible bias toward defendant. Third, the State had petitioned for contempt citations against Burns and Bland for failure to appear at trial in response to subpoenae served upon them. The suggestion in the dissenting opinion that this was a subterfuge finds no support in the record. Rather, because it indicates they were not eager participants in the

investigation or trial, it is negative of any conspiracy. Fourth, the trial court commented that Myra Sexton was an "exceptionally good witness," and the defense does not indicate otherwise. It appears to us that had there been a conspiracy to frame defendant, it would have been easy—indeed logical—for Sexton to corroborate Burns and Bland; instead, she testified that she did not witness the shooting, stating that she was present only during the early evening hours. During that period, it should be noted that her testimony is corroborative of Burns and Bland. Fifth, in a further attack on the credibility of Burns and Bland, the defendant and the dissenting opinion point to a conflict in their testimony in that Burns testified to damaging statements made by defendant before and after the shooting, but Bland said that he did not hear those statements. We think, however, that had there been a conspiracy to frame defendant, Bland would surely have corroborated the testimony of Burns concerning those statements. Our further examination of the record discloses no support for a conspiracy to frame defendant.

██ Defendant next asserts that several inconsistencies between the testimony of Burns and Bland, as well as contradictions thereof by defense witnesses, undermine their credibility and raise a reasonable doubt of his guilt. In this regard, he first states that "Burns said defendant already had a pistol with him" prior to the early evening argument with Adams, but that Bland testified that he, Burns, and Shaffer accompanied defendant to obtain a gun. A close examination of the record reveals, however, that Burns was not asked, nor did he specify, where or when defendant obtained the gun; he merely testified, as did Bland, that at one point during that argument defendant drew a gun and pointed it at Adams. Thus, we see no inconsistencies with regard to this testimony. Furthermore, in our view, the details as to when and where defendant came into possession of the gun are merely collateral matters of questionable import. What is significant is that the State's witnesses made positive, consistent statements that defendant was with them throughout the evening and that at some time before midnight—the time of the shooting—he drew a gun and threatened Adams with it.

Defendant also points to a conflict between Burns' testimony— that defendant said, "I am fitting to get this chump" before shooting the victim and, "I just shot this chump" as he fled from the scene— and Bland's testimony—that he did not hear defendant make these statements despite being only three to four feet from Burns when they were allegedly made. Once again, however, the record discloses that Bland, who testified after Burns, was never asked whether he

heard defendant say anything prior to the shooting, and although he stated that he did not hear defendant say anything as he ran away, in view of Bland's unequivocal testimony that he saw him shoot the victim, we do not find it significant that he did not hear defendant confirm what he had personally observed only moments earlier. See *People v. Rodriquez* (1981), 100 Ill. App. 3d 244, 426 N.E.2d 586.

■ Similarly, we are not persuaded by defendant's argument that the credibility of Burns' and Bland's accounts of the shooting was seriously damaged because their testimony that defendant acted alone in this crime was contradicted by that of Wells, a disinterested eyewitness, who stated that after the shooting the gunman was joined by and ran away with a second man. We see no contradiction, however, as all three testified that the gunman was alone during the shooting. While Wells testified that the gunman walked toward 40th Street and crossed Drexel Avenue where he was joined by the other man, neither Burns nor Bland was asked whether defendant fled the area alone. There is also nothing in the record to indicate either knew what defendant did after he passed them following the shooting, or whether from their positions they would have been able to see the point where Wells said the gunman was joined by another man. Moreover, the versions of Burns and Bland concerning the occurrence were otherwise substantially corroborated by Wells' testimony that when he heard a gunshot, he turned and saw a man standing over a person lying on the sidewalk on the east side of Drexel Avenue, and that after the gunman fired a second shot he reached down and removed something from the victim's pocket and then ran westward, across Drexel, toward the housing project, where he was joined by a second man.

■ With respect to the contradictions by defendant's sisters (Karen and Laydia) of Burns' denial that he and Shaffer threatened defendant's family at his apartment, we first note—as did the trial court—that Karen testified that when she saw the man, whose nicknames she later learned were "Rab" and "Bo," she slammed the apartment door, whereupon "Rab" said that he would kill her and her family if defendant told anyone what he knew; whereas, her sister Laydia testified that she did not hear the men say anything after the door was closed. Thus, Laydia did not corroborate Karen's testimony regarding the alleged threat, as defendant asserts, and the trial court was therefore presented with a conflict only between the statements of Burns and Karen. As the supreme court has stated, "where *** the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact *** to ascertain the truth." (*People v. Hammond* (1970), 45 Ill. 2d 269, 278, 259 N.E.2d 44, 48.) In the instant case, the

trial court chose to believe Burns, rather than Karen, observing that her sister did not hear the threats. Because the trial court had the opportunity to hear the evidence and observe the demeanor of both witnesses, we cannot say its determination as to her credibility was erroneous.

■ Nevertheless, it is also defendant's position that the testimony of Bland was completely negated by that of student intern Sosnowski, who stated that during an interview prior to commencement of this trial, Bland told him and defense counsel that what he related to the police did not really happen and he feared that if he told them the truth he would thereafter be charged with perjury, but that he would not answer any questions before consulting with his attorney. Bland not only denied making the statements testified to by Sosnowski, but also stated that he refused to answer defense counsel's questions without the benefit of private counsel. The trial court commented that, to the extent the testimony of Bland and Sosnowski conflicted, it believed the latter, and defendant syllogizes therefrom that everything Bland told the police and repeated at trial was a lie, and therefore that Bland's testimony as to seeing defendant commit the murder was entitled to no weight.

■ We reject defendant's reasoning, noting that while Bland was discredited to some degree by Sosnowski's testimony, we cannot assume—as defendant posits in his brief—that Bland's admission to defense counsel meant that "everything [he] told the police *** was a lie," particularly since the trial court also found Bland's account of the shooting to be credible, and specifically noted that impeachment of a witness does not automatically mean that the whole of his testimony was fabricated. Moreover, it is well settled that the credible testimony of a single eyewitness is sufficient to sustain a conviction. (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 64; *People v. Rodriquez* (1981), 100 Ill. App. 3d 244, 426 N.E.2d 586.) Here, the trial court also stated that it believed Burns' testimony, which was corroborated by Sexton, who testified that defendant was drinking and smoking marijuana in front of her apartment a few hours before the shooting and that, during an argument with Adams, he (defendant) drew a gun and threatened Adams. The testimony of Burns was also corroborated in part by Wells, whose account of the shooting was essentially the same as Burns', and by the testimony of Paulette Jones regarding the discovery of the victim's revolver in a red container behind a senior citizens' home, which substantiated Burns' testimony as to where defendant said he hid the gun. Thus, even without Bland's testimony,

we find that there was sufficient credible evidence to support defendant's conviction.

■■ Finally, with respect to the sufficiency of the evidence, defendant asserts that the "myriad instances" of impeachment of both Burns and Bland at trial so severely impaired their credibility as to raise a reasonable doubt of his guilt. In his brief, defendant has charted numerous details which were included in their trial testimony but which were not told to the police when they were questioned about the crime. Specifically, defendant points out that neither Burns nor Bland told the police that Shaffer was with them throughout the evening in question; that he (defendant) came to Shaffer's house the following morning; that while there, he said he shot the victim and described where he hid the guns; that they accompanied him to search for the guns; or that he returned to Shaffer's house later that afternoon carrying a .38-caliber revolver from which he removed two spent cartridges. While it is true that a witness' failure "to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would, state such fact, if true, may be shown to discredit his testimony as to such fact" (*People v. Henry* (1970), 47 Ill. 2d 312, 321, 265 N.E.2d 876, 882), we note that there is nothing in the record here indicating that either witness was questioned by the police concerning these matters. In view of their testimony that they wanted no involvement with the police, which was corroborated by the fact that they did not contact authorities to report what they had seen as well as by their reluctance to testify—both of which were noted by the trial court in its findings relating to defendant's theory that they conspired to "frame" him—we do not believe it likely that either Burns or Bland would have volunteered any information not specifically requested by the police. See *People v. Green* (1983), 118 Ill. App. 3d 227, 454 N.E.2d 792; *People v. Rodriquez* (1981), 100 Ill. App. 3d 244, 426 N.E.2d 586.

In the light of the foregoing, we are of the belief that there was sufficient credible evidence presented to the court to support its finding of guilt beyond a reasonable doubt.

■■ Defendant next contends that he was denied a fair trial because the court improperly considered and was influenced by matters not in the record. We note, however, and defendant concedes, that absent a contrary showing, it is presumed that the court in a bench trial considered only competent evidence in arriving at its verdict. *People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849; *People v. Earullo* (1983), 113 Ill. App. 3d 774, 447 N.E.2d 925, *cert. denied* (1984), ___ U.S. ___, 79 L. Ed. 2d 761, 104 S. Ct. 1441.

Here, defendant posits that the court's comment on the fact that he answered ready for trial on the first day the case appeared on the trial call implied that the court believed he "was acting in concert with the prosecution witnesses." A review of the record, however, reveals that the comment was made two months after defendant was found guilty during a hearing on his post-trial motion to reopen the evidence, at which defense counsel argued that the State's witnesses conspired to "frame him." In denying the motion to reopen, the court said:

> "There is no question in my mind that Burns and Bland did not want to testify against defendant in this case. Defendant never thought they would come forward, which is one reason I suspect there was a demand for trial from the date that this case came to my call."

We find nothing therein to support defendant's assertion that the trial court "seemed to feel" there was a "conspiracy" between him and the State or its witnesses. Indeed, the record supports the trial court's statement that Burns and Bland were reluctant to testify, and there is further support for the court's conclusion—that he (defendant) did not believe the State had sufficient evidence to convict him and therefore chose to immediately proceed to trial—in defendant's own statement that "I didn't feel all this was going to happen to me. I just wanted to go ahead and let it all be over with and leave it alone." In view of the speculative nature of his assertions, we find that defendant has failed to rebut the presumption that the trial court considered only proper evidence in finding him guilty.

Defendant next contends that the trial court abused its discretion in denying his motion to reopen the evidence, arguing only that "where, as here, the need is great and the burden small *** it is unfair to shut off the proofs" because the trial court should consider as much relevant evidence as possible.

The decision whether to grant a defendant's motion to reopen the case for further testimony is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion (*People v. Siciliano* (1954), 4 Ill. 2d 581, 123 N.E.2d 725, *cert. denied* (1955), 349 U.S. 931, 99 L. Ed. 1261, 75 S. Ct. 774; *People v. Henry* (1982), 103 Ill. App. 3d 1143, 432 N.E.2d 359), and the burden is on the party seeking to reopen to show sufficient reason therefor (*People v. Housby* (1975), 26 Ill. App. 3d 92, 324 N.E.2d 465). In the present case, defendant was found guilty on January 6, 1983, and moved to reopen the case on February 28, 1983. The court permitted him to make an offer of proof in the form of testimony given

under oath with cross-examination as to the evidence sought to be admitted. In the offer of proof, Robert Lee Clark testified that he and defendant were riding their bicycles southbound on Drexel Avenue on their way home from spending "practically all day" together at the lake when he heard two shots and saw a man running across the street with a gun in his hand. The man hollered to and was joined by a second man, and then they both ran into the housing project. Clark did not recognize, nor could he describe, either of the two men he saw running. Although he learned the next day that defendant had been arrested, he did not contact the police because he was afraid, and he first told defense counsel sometime in late December 1982 that he was with defendant at the time of the shooting.

Although defendant testified to essentially the same version of the shooting incident as did Clark, he also stated that after having a tooth pulled earlier that day he went home to bed, and later went to the store, before going out with Clark. He further testified that although he recognized the man carrying the gun as David Burns, he did not report what he saw to the police because of a threat made to him the following day by two unidentified men, and admitted not giving the information about Clark to his attorney until "after the trial began," *i.e.,* some unspecified time after December 9, 1982.

It was also stipulated that, if called, two detectives who interviewed defendant at the police station six days after the shooting would testify that defendant told them he returned from the dentist at about 5:30 p.m. and remained at home in bed on the night of August 9 and the morning of August 10, 1982.

The trial court denied defendant's motion to reopen, finding that the proposed evidence was neither credible nor newly discovered, and that defendant had failed to exercise diligence in presenting it. These findings, which will be further discussed below, are clearly supported by the record. Moreover, the court further stated that even if the evidence were admitted, its findings and verdict would remain unchanged. Under these circumstances, it is our view that the court properly exercised its discretion in denying the motion and excluding the evidence.

■■ Defendant correlatively contends that certain remarks by the court established that it had improperly shifted the burden of proof in this case to him and thereby denied him a fair trial. He first directs our attention to the following colloquy between defense counsel and the court regarding the credibility of the State's witnesses and what, if any, motivation they had to testify falsely:

"THE COURT: What about Myra [Sexton], what reason has

Myra got? As you recall Myra was an exceptionally good witness ***.

* * *

DEFENSE COUNSEL: Your Honor, I am not in a position to answer that question but what you are doing right now, with all due respect, you are shifting the burden of proof on me to explain why did these 3 people concoct a story ***.

THE COURT: I agree."

Defendant argues that the court's response to counsel's allegation shows that it improperly placed the burden of proof in this case on the defense. However, as defendant notes, the above-quoted exchange took place not at trial but at the hearing on his motion to reopen the case wherein defense counsel's argument for admission of the evidence presented in the offer of proof was grounded on the theory that the State's witnesses had fabricated their testimony in order to "frame" defendant. As the issue of witness credibility had been vigorously argued by defense counsel and resolved by the court at trial, and because—as we have previously stated—the party moving to reopen the case must show sufficient reason for doing so (*People v. Housby* (1975), 26 Ill. App. 3d 92, 324 N.E.2d 465), it was in fact the burden of the defense to show what new evidence there was to support that reopening; and it was that burden to which the trial court's response to counsel was directed.

██ The second comment cited by defendant was made during the court's ruling on the post-trial motion. The court stated:

"It is difficult for this court to believe a two-year Army veteran would sit there and listen to 3 witnesses testify about him shooting another person and waving a gun around only because the tall man and his friend said that if he, the defendant, saw [*sic*] anything he would find himself in the morgue.

He, the defendant, would have the Court believe that he just sat there while the actual murderer testified that he, the defendant, did it, because he was afraid."

Defendant insists that this was an improper comment on his failure to testify at trial and is further evidence that the court shifted the burden of proof to him. We disagree.

Initially, we note that in addition to the above, the court also commented:

"[E]ven though the testimony in this case is over prior to Christmas, defendant per his attorney, first tells her about another account at Christmastime. Even though the case is set for decision on January 6, 1983, no motion to reopen the proofs

is filed or requested.

After a finding of guilty, defendant's attorney then first makes a motion to reopen proofs *** [and] in her argument *** on the motion *** she indicates that she believes the defendant is innocent *** even though [he] has been far from candid with even his own attorney.

\* \* \*

When he finally saw what dynamite the State had against him he apparently started to worry and told his attorney *** another account of what happened. Nothing is done even though all were aware that the Court would render its decision on January 6, 1983.

\* \* \*

Defendant wanted his cake and he wanted to eat it also."

■■ We think that when the remarks complained of are read in conjunction with these additional comments and in the context of the court's statement in its entirety, it becomes apparent that the trial court was commenting not on defendant's failure to testify at trial, but rather, on (a) the incredibility of his testimony on the offer of proof that he sat through the entire trial while State's witnesses—one of whom he believed to be the actual murderer—testified that he had committed the crime, without telling his own attorney that there was a witness who was with him the night of the shooting who knew he did not commit the crime; and (b) the lack of diligence in the presentation of the motion where, although defendant gave the information to his attorney during the trial, which was concluded on December 22, 1982, with the finding of guilt entered on January 6, 1983, the motion to reopen was not presented until February 28, 1983. Clearly, these were properly considered by the trial court in determining whether there was sufficient, credible reason to reopen the case.

In *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288, the supreme court considered the propriety of the denial of defendant's motion for a new trial on the ground of newly discovered evidence. Without deciding whether the evidence met the standards for "newly-discovered evidence," the court affirmed the trial court's denial of the motion, stating:

" 'Applications for a new trial on the ground of newly discovered evidence are not looked upon with favor by the courts, and in order to prevent, so far as possible, fraud and imposition which defeated parties may be tempted to practice, as a last resort, to escape the consequence of an adverse verdict, such application should always be subjected to the closest scrutiny by

the court, and the burden is upon the applicant to rebut the presumption that the verdict is correct and to show there had been no lack of diligence.' " (*People v. Reese* (1973), 54 Ill. 2d 51, 59, 294 N.E.2d 288, 292.)

Although *Reese,* unlike the case before us, involved a post-trial motion for a new trial, we believe the principles expressed therein are nonetheless applicable to a post-trial motion to reopen the case, and we find that in the light of defendant's admitted failure to inform his attorney of the witness Clark, as well as the implausibility of his explanation for failing to confide in her, the trial court's comments were merely expressions of its findings on the motion and in no way indicated it had shifted the burden of proof in the case to defendant.

For the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

MEJDA, P.J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. The record in this case reveals that the State's evidence is woefully unpersuasive and that the trial judge committed grievous errors in his rulings and findings. Reversal of the defendant's murder conviction and sentence is therefore demanded. Inasmuch as the defendant vociferously protests his innocence and adamantly argues that the evidence fails to establish his guilt beyond a reasonable doubt, a chronology of the events of this case, the trial evidence and the court's findings and rulings necessarily follows.

On August 10, 1982, shortly after midnight, Garrison Hester, a security guard, was fatally shot and robbed of his service revolver while walking northbound on the east side of the 3900 block of South Drexel Boulevard in Chicago. Ernest Wells witnessed the murder-robbery. Wells was driving south on Drexel when he heard a shot. He looked around and saw a man standing on the opposite (east) side of Drexel pointing a gun at the victim, who was on the ground. The assailant fired another shot into the victim, went into the victim's pocket, turned around and walked south on the east side of Drexel toward 40th Street. Wells stopped his car on Drexel "to look at what was happening." The assailant walked about 50 feet, turned and started jogging westward across the median on Drexel. After the assailant arrived on the west side of Drexel, Wells saw another man join the assailant, and the two men ran off together.

Wells started his car, went to the next intersection, made a U-turn and came back to see what he could do for the victim. He drove to where the victim was lying on the sidewalk. As Wells was en route to get the police, he almost collided with a squad car. Wells immediately gave the police the following description of the assailant:

"A black man about 18 or 19 years old, with short hair, about 5'8 or 9, he wasn't black but he was about dark tan, darker than his [Wells'] girl friend [*sic*], \*\*\* and weighed about 140 to 150 pounds."

When he witnessed the incident, Wells viewed the right profile of the assailant for five minutes from a distance of 200 feet. Wells did not immediately approach the victim, however, because the assailant had a gun.

Apparently, Wells believed that he could identify the assailant, because four days later he went to a police station and viewed a lineup. Defendant, Steve Shore, was in the lineup. Wells did not identify Shore as the assailant. In fact, Wells testified at trial that he did not know the defendant and "had never seen him before."

The State did not call Wells as a witness at trial. Instead, Wells was called by the defendant. Cross-examination by the State was waived.

The record reveals the defendant's description to be as follows:

"Six feet tall, 175 pounds, 20 years of age, medium to light complexion."

The record also reveals that the defendant's complexion was lighter than the complexion of Wells' girlfriend.

The trial judge concluded: "*I believe Ernest Wells* [*sic*] however, did not help the State or the defendant." (Emphasis added.)

I am of the opinion that the trial court unjustifiably refused to recognize that: (1) Wells' description of the assailant was not that of the defendant; (2) Wells never stated that he could not identify the assailant; (3) Wells did not identify the defendant in the lineup as the assailant, and (4) Wells testified at trial that he had never seen the defendant before. Like the trial court, this court also unjustifiably refuses to recognize Wells' extremely salient testimony. As will be discussed in more detail, the trial court's and this court's treatment of other facets of Wells' testimony is convoluted.

The defendant served in the United States Army from 1979 to the end of 1981, during which he received his high school G.E.D. diploma. After being honorably discharged from the Army, he returned to Chicago, lived with his family, and for six or seven months was employed as a maintenance man at the Fountainbleu Manor Nursing Home,

6200 North Winthrop. For three or four months thereafter he was employed at Kokomo's Meat Market, 5558 West Harrison, packing, shipping and selling meat. He was working there on the day of his arrest, August 14, 1982.

The record is completely silent and does not reveal why, how or under what circumstances this six-foot, 175-pound, 20-year-old medium-complected defendant, who had no prior criminal record, was arrested and placed in a lineup to be viewed by the homicide eyewitness, Ernest Wells, who promptly described the assailant as five feet eight or nine inches, 140 to 150 pounds, 18 to 19 years old and of a dark tan complexion.

It is readily discerned from the record, however, that while in police custody the defendant implicated David "Bo" Burns to the police. "Bo" Burns had been a five-year foot soldier of the El Rukn street gang, whose headquarters were at 39th and Drexel, "just a few steps away from where the shooting happened." Burns was incarcerated in 1974 for a murder which he contended he did not commit and was a "frame." He eventually pleaded guilty to the offense of robbery "to get out of the jail" and received five years' probation.

Burns ultimately became one of the State's star eyewitnesses to the homicide. He testified on direct examination as follows:

"Q. All right, do you recall when it was that you first spoke to any policeman in connection with this incident?

A. Yes, the police was looking for me and Chester ['Blood' Bland].

Q. And did you eventually speak to any officers?

A. Yes.

Q. When was it that you first spoke to some officers?

A. I called to the police station and they left a card with my brother. I called the police station and told the police to meet me inside the lounge and I'll be there.

Q. What lounge did you go to?

A. The Regency, the Hut, 41st and Cottage Grove.

* * *

Q. Did you meet any police officer there?

A. Yes, I met three officers.

* * *

Q. Where did you go when you met the police?

A. Where did I go? They took me to 51st Street.

Q. When you got to 51st Street, did you talk to them about this incident?

A. Yes, I talked to one of the officers.

Q. All right, during your conversation with any of the officers, did any of them say they were going to put this case on you?

A. He was saying that Steve Shore said *** 'I am the one that killed the guard.' "

On cross-examination, "Bo" Burns testified:

"Q. When you were in the police station the police had you in custody, didn't they?

A. Yes, I was in custody.

Q. They had you in an interview room, didn't they?

A. Yes.

Q. In fact they told you that they were going to give the case to you if you did not name Steve Shore, didn't they?

A. They told me—

Q. Answer my question, Mr. Burns, please, yes or no?

A. What?

Q. They told you that they were going to give the case to you unless you named Steve Shore, didn't they?

A. *They said Steve Shore tried to give the case to me.*

Q. Answer the question, Bo.

* * *

THE COURT: It can be answered yes or no. They told you that they were going to give the case to you? Can you answer that yes or no? Is that what the police told you?

A. Yes.

BY MS. LYON [defendant's attorney]: They also told you, didn't they, Bo, that Steve Shore was in custody and they told you his name, didn't they?

A. *Yes, they told me Steve Shore was in custody.*

* * *

Q. Now, Bo, *you were afraid that you were going to get charged with this crime, weren't you?*

A. *The police got me—yes, I was afraid.*" (Emphasis added.)

Chester "Blood" Bland, like "Bo" Burns, was a former five- or six-year member and foot soldier of the El Rukn street gang. This court unconvincingly points out that "there is nothing in the record refuting the testimony of Burns and Bland concerning" their disassociation from the "El Rukns." Had they remained the accused, however, there is no doubt that the State would adamantly urge that their testimony of withdrawal from this street gang was incredible.

Testifying for the State as an eyewitness to the homicide,

"Blood" Bland stated on cross-examination as follows:

"Q. Now the police came and got you and brought you to area one in connection with this case, is that right?

A. No.

Q. You didn't go to area one?

A. I went to 51st Street, yes.

Q. The police came and got you and brought you there?

A. Yes.

Q. And they put you in an interview room, right?

A. Right.

* * *

Q. You didn't call the police that night, did you?

A. No, I didn't call the police at all.

Q. In fact, the police had to come to get you, right?

A. No, [*David "Bo"*] *Burns told me the police wanted to see me.* They had been by my girl friend's house [*sic*].

Q. You called the police and they came and got you?

A. Right. *I didn't make the call. Burns made the call. They called Shaffer's mother's house and they met me and Burns across the street.*" (Emphasis added.)

Myra Sexton was a third prosecution witness. She did not witness the homicide, however, She testified that the defendant had a gun and that he was in front of her home at 4014 South Drexel four hours before the homicide. On cross-examination, Sexton testified that she had talked to an assistant State's Attorney about her testimony in the presence of "Bo" Burns, "Blood" Bland and "Rab" Shaffer. Further cross-examination of Sexton elicited the following:

"Q. *And in fact you talked about what happened, about the shooting of the security guard and all that? You talked about that with Bo, Blood, before you talked to the police, didn't you?*

A. Yes, you could say.

Q. And you talked to the police a few days after this incident, right?

A. Yes.

Q. And the police brought you down to 51st and Wentworth and you talked to them there, right?

A. Two days, yes.

Q. *You were down there for two days?*

A. *Yes, you could say.*

Q. *In fact, they asked you a lot of questions, didn't they?*

A. *Seven hours worth of questions.*

Q. Now where you live it's very close to the El-Rukin head-

quarters, isn't it?

A. Yes.

Q. There are a lot of El-Rukin members in the neighborhood?

A. True.

         \* \* \*

Q. You're friends with the El Rukins?

A. I know several of them.

Q. *In fact you are pretty good friends with Bo, aren't you?*

A. *Yes, you can say.*

Q. *You're pretty good friends with Blood, too?*

A. *Yes.*

         \* \* \*

Q. *Now when you say the police questioned you for seven hours, they kept you in an interview room?*

A. *Right.*

Q. *They wouldn't let you leave, would they?*

A. *No."* (Emphasis added.)

The fact that the police custodially interrogated Sexton, who did not witness the incident, for two days or seven hours is of no small significance.

It would not be productive to speculate on the probability or improbability of whether the defendant would (1) commit a homicide in the presence of the three eyewitnesses, Ernest Wells, an impartial witness, "Bo" Burns and "Blood" Bland, who described themselves as the defendant's drinking buddies; (2) thereafter appear in a police-conducted lineup and not be identified by Wells as the assailant; (3) deny his involvement in the homicide, and (4) then implicate his purported friends "Bo" Burns and "Blood" Bland in the commission of the homicide which they witnessed the defendant commit. It would likewise be unfeasible, but by no means insurmountable, to accurately conjecture on the dialogue between Myra Sexton, "Bo" Burns, "Blood" Bland and "Rab" Shaffer during their extensive pre-custodial conferences among themselves and during the protracted custodial conference with the police.

In any event, promptly after these numerous conferences, Steve Shore was no longer the accuser of "Bo" Burns. Instead, Shore was suddenly switched by the former El Rukns (Burns and Bland) from the accuser to the accused and "Bo" Burns and "Blood" Bland became the accusers. Ultimately, Steve Shore was charged with the robbery and murder of Garrison Hester.

Thus, by this mere fluctuation the State was vacillated from the tenable position that these two El Rukn street gang members were unreliable and unworthy of belief as defendants, to the untenable position that

they were believable, trustworthy and credible witnesses for the State.

On August 14, 1984, when "Bo" Burns, "Blood" Bland and Sexton concluded their conferences among themselves and with the police officers, Hester's service revolver had not yet been recovered. At this time, neither "Bo" Burns or "Blood" Bland had made a single statement to the officers about any conversation with the defendant subsequent to the homicide about any concealment of, search for or discovery of the victim's gun or the murder weapon.

However, at the time of trial on December 9, 1982, the victim's weapon had been discovered. Paulette Jones testified that on Sunday, August 22, 1982, at about 1 p.m., she and her friend Jerry discovered a gun in a red box next to a garbage can near her father's church at 702 East 43rd Street in Chicago. She flagged a passing police officer who retrieved the gun, which the evidence established was registered to Garrison Hester, the deceased. As hereinafter pointed out, "Bo" Burns and "Blood" Bland conveniently expanded and adjusted their subsequent trial testimony to this belated discovery of the victim's weapon.

The preliminary hearing on August 16, 1982, was continued on the State's motion to August 31, 1982, at which time David "Bo" Burns testified and the trial court entered a finding of probable cause.

The following day, September 1, 1982, the defendant's attorney, Andrea Lyon, and Drew Sosnowski, a 21-year-old law school senior who was interning with the Cook County Public Defender's office, went to 7033 South Claremont, the home of Chester "Blood" Bland. Sosnowski testified at trial that when attorney Lyon told "Blood" Bland that she wanted to ask him about the case, Bland stated "*** that what he [Bland] told the police didn't really happen and that he was afraid that if he told us what really happened that he could be charged with perjury *** and that he wouldn't say anything else because he wanted to talk to his attorney ***." Sosnowski testified further that upon leaving Bland's house he wrote a memorandum of this conversation while sitting in the car, that he later had this memorandum typed and that he signed it.

"Blood" Bland testified on direct examination at trial that attorney Lyon and another person came to talk to him and that Lyon told him that she was defendant's lawyer. The record reveals the following:

"Q. What did you tell her?

A. She asked me about, she wanted to talk to me about the case. And I told her I don't want to say anything unless I had a lawyer, somebody to talk to first."

While no question is raised or made concerning Bland's right not to talk to attorney Lyon without a lawyer, nor is any question raised regarding his right to a lawyer, nevertheless a question *can* be persuasively

made and raised on his *reason* for not wanting to talk to her and his reason for not wanting to do so without a lawyer.

On redirect examination, "Blood" Bland testified further:

"Q. When you talked to Ms. Lyon when she came and she gave you her card, did you tell her you wanted to talk to a lawyer first?

A. I said I would like to talk to a lawyer first before I say anything. She gave me the card. I said after I talk to my lawyer I'll call you."

"Blood" Bland denied on direct examination that he told attorney Lyon that he did not want to talk to her about what really happened on the night of the incident because he was afraid that if he told the truth he would be charged with perjury. On cross-examination he reiterated his denial:

"Q. You are saying here today under oath you did not tell us that you did not want to talk to us about what really happened that night until you talked to your lawyer because you were afraid that if you told us the truth you could be charged with perjury in light of what you told the police?

A. I did not say that.

* * *

Q. And are you saying here today that you never said the word 'perjury' to me in regards to what you said to the police?

A. No. I never said the word 'perjury.'

Q. You never said it.

A. Nope."

With regard to this irreconcilable conflict between the testimony of State's witness "Blood" Bland and defense witness Sosnowski, the trial judge concluded:

"I also believe Drew Sosnowski, the law student who testified in this case, and where his account differed from Chester ('Blood') Bland's I believed Sosnowski, but I again call to your attention People v. Klein [Kline], 92 Ill. 2d 490, impeachment is not synonymous with fabrication." (Emphasis supplied.)

The trial court and this court made a Herculean effort to rationalize and reconcile this testimonial conflict between Sosnowski and "Blood" Bland. The trial judge believed and found that "Blood" Bland told attorney Lyon and Sosnowski "that what he told the police didn't really happen" and "that if he told what really happened he could be charged with perjury," which "Blood" Bland denied.

This conflict between Sosnowski's and Bland's testimony defies rationalization. Moreover, inasmuch as "Bo" Burns' statement to the police, his trial testimony, Bland's statement of the shooting to the police,

which Bland said "didn't really happen," and Bland's trial testimony are somewhat the same, the trial court's and this court's reliance on "Bo" Burns' testimony to sustain and affirm the defendant's conviction is grossly unwarranted.

After the above-mentioned aborted interview of "Blood" Bland by attorney Lyon and intern Sosnowski on September 1, 1982, the defendant was arraigned on September 21, 1982, and answered ready for trial. The trial was continued on the State's motion to October 4, 1982, and on that date the defendant again answered ready for trial. The trial was again continued on motion of the State to October 25, November 18, December 1 and to December 2, 1982. On each date the defendant answered ready for trial.

On the afternoon of December 1, 1982, following the trial continuance earlier that morning, the defendant's sister, Karen Shore, a second-year high school student, was at home, where she lived with her mother, at 709 East 41st Street, apartment 302. Karen testified that she heard a knock at the front door. Her younger sister, Laydia, opened the door. Karen heard "Rab" Shaffer ask Laydia whether her mother was home. Karen went to the door, which had been opened by Laydia, and at the door were "Bo" Burns and "Rab" Shaffer. "Rab's" feet were in the door. "Rab" then asked Laydia whether any of her sisters were home and Laydia said no. Karen testified that she slammed the door, whereupon "Rab" said, "Tell your brother he just better not tell anything. I'll kill all you m----- f----." Karen's other sister, Phyllis, then called the police, who came to the apartment shortly thereafter.

Laydia Shore, the defendant's 15-year-old sister, corroborated Karen's testimony. Laydia testified that on December 1, 1982, after she had returned home from school at about 2:30 p.m., "Bo" and "Rab" knocked on the apartment door. She opened the door, "Rab" asked whether her mother was at home and Laydia told him no. Laydia testified further that "Rab" then said, "Tell your mother—" and Karen promptly came and closed the door in "Rab's" face. Laydia stated that she told her sister, Phyllis, to call the police and that they responded to the call and came to the apartment. She testified further that she did not hear what "Rab" said after Karen slammed the door because she ran to the back of the apartment.

It appears in the record that the Shore sisters also immediately notified the defendant's attorney, Lyon, of these threats and that Lyon notified the assistant State's Attorneys who were assigned to the Steve Shore case. The record further reveals that "Bo" Burns admitted that he and "Rab" Shaffer were at the Shore residence. On cross-examination of "Bo" by Lyon, the following occurred:

"Q. I want to call your attention, Mr. Burns, to last week, Wednesday, December 1st and I want to call your attention to the place, 711 East 41st Street, second, third floor. Were you and your buddy, Rab, up there threatening Steve Shore's family?

MR. JOHN MORRISSEY: Objection, your Honor.

THE COURT: Basis.

\* \* \*

MR. SPIVACK: How is she going to prove it up? Ms. Lyon came to us and said there was someone. We had no idea—

MS. LYON: That's a lie. *I told you who he was. I called the police. I called the State's Attorney. I called gang crimes.* I called everybody. *You know all about this.*

MR. SPIVACK: You said you knew somebody?

MS. LYON: Told you it was Bo and another guy.

\* \* \*

THE COURT: On December 1st, 1982, last Wednesday, at 711 East 41st Street, second floor, did you threaten Mr. Shore's family?

A. No.

BY MS. LYON: Were you there with Rab pounding at their front door?

A. I was downstairs and Andrew Shaffer went upstairs to tell Steve Shore's ma that we don't want to see her son go to the penitentiary.

BY MS. LYON: I see. You weren't there in the hall when the door was opened and stuck up with Rab's foot? You weren't there? Were you in the hall, yes or no?

A. I was downstairs.

Q. Were you in the hall, yes or no?

A. I was downstairs on a bike.

Q. And were you present when— on a bike, did you say?

A. Both were on bikes.

Q. Were you present when Rab said, 'Steve Shore better not tell on us?' Were you present?

MR. MORRISSEY: Objection.

BY THE WITNESS: Rab didn't say nothing like that.

MR. MORRISSEY [assistant State's Attorney]: \* \* \* We have not under the rules of discovery been given any kind of amendment to the Defense's answer to discovery to include number one, witnesses to this alleged transaction nor a summary of any statements concerning what is attempting to be proved here. I am taken by surprise by this.

\* \* \*

THE COURT: Okay, I take it that you didn't know who exactly did the threatening?

MS. LYON: *I didn't have the real name for Rab until this morning when the State added Mr. Shaffer to their list of witnesses.* I now know they are one of the same person \* \* \*. I do not believe the State is taken by surprise because *I called the State's Attorney. I called gang crimes, I called Area one Homicide,* and I went there and I talked to all these people.

And *I told Mr. Morrisey, in fact I saw him and spoke to him person to person as I was coming back in the building from having gone out to Mrs. Shore's home to get as much of the details of this as I could. I was frankly concerned for my client's family's safety. I did everything I knew to try to protect them.* This is no surprise to anybody.

MR. SPIVACK [assistant State's Attorney]: We had no names. I asked Ms. Lyon if we could have names. We don't tolerate threats. Give us the names. She thought it was some of the State's witnesses. Didn't have any definite names.

MR. MORRISSEY [assistant State's Attorney]: \* \* \* I will admit I spoke to Andrea Lyon about this alleged incident. But I wasn't prepared for her to come in and make substantive use or affirmative use of these factors at trial. Certainly I should have rendered the names and addresses of the witnesses.

THE COURT: I will tell you what I will do. I think it is important enough. We should hear it. Prior to any of the family going on you will have an opportunity to interview them.

MS. LYON: Absolutely, I'll make them available."[1] (Emphasis added.)

It is unlikely that, and indeed difficult, if not impossible, to conceive why the Shores would abruptly close the door in "Rab's" face, immediately call the police and thereafter promptly call defense attorney Lyon, if "Bo's" and "Rab's" mission to the Shore home was to express their sympathy to the defendant's mother that they "don't want to see her son go to the penitentiary." Moreover, "Bo" would not have heard what "Rab" said at the entrance to the third floor apartment if he, "Bo," re-

---

[1]On oral argument of this case, defendant's attorney, Lyon, stated, "If your Honors will recall, in the record there was testimony by two of his sisters, one of whom now in fact has been murdered, that the house was invaded or there was an attempt to invade the house and threats were passed by this new witness who appeared the day of trial who they did not put on the stand \* \* \*." She made no suggestion, however, that the murder of the defendant's sister was in any way related to this case.

mained downstairs on his bike as he testified he did. It is also significant that on the very eve of trial, the State, over the defendant's objection, added Andrew "Rab" Shaffer to its list of witnesses. Although he was available at trial, the State did not call him as a witness to rebut the threats attributed to him by the Shore sisters. It is also extremely pertinent that the threats and conduct of "Bo" Burns and "Rab" Shaffer, the Shore sisters' report to the police and attorney Lyon, and Lyon's report to the assistant State's Attorneys all occurred immediately before this case was scheduled to proceed to trial.

In ruling on the defendant's post-trial motion to reopen the proofs, the trial judge stated, "I do not believe Karen Denise Shore. She was impeached by her sister's account." The trial judge neglected to point out wherein Laydia Shore's testimony impeached Karen's testimony, however. Indeed, the trial court could not do so, because Laydia's testimony is not contradictory, inconsistent or inapposite to Karen's. In fact, Karen's and Laydia's testimony is unquestionably supportive, corroborative and synonymous.

"Bo" Burns' testimony, in which he admitted being at the Shore residence on December 1, 1982, with "Rab" Shaffer, does not rebut the testimony of the Shore sisters of the threats from "Rab." "Bo" Burns, if his testimony is to be believed, was downstairs on his bicycle and therefore could not possibly have known what threats "Rab" made at the third-floor entrance to the Shore apartment. But although "Rab" was available as a witness to dispute the alleged threats, the State nonetheless refused to call him to testify. It is well settled, of course, that it is the trial court's function to determine the credibility of a witness. However, that function must be exercised within the evidentiary framework presented at trial, and when a trial court's basis for disbelieving a witness is completely unsupported by such evidence, the court's determination of credibility is obviously erroneous and is not entitled to consideration on appellate review.

This court's efforts to support and affirm the trial court's rejection of the testimony of Karen and Laydia Shore is unacceptable. This court reasons that Laydia's testimony does not corroborate Karen's because she did not hear "Rab's" threats after Karen slammed the door. Laydia did not hear "Rab's" threats after the door was slammed simply because, as she testified, when the door was slammed she ran to the rear of the apartment to tell Phyllis to call the police. Second, Laydia corroborated Karen's testimony about "Rab's" and "Bo" Burns' presence at the third-floor entrance to their apartment. Burns, in turn, corroborated Karen and Laydia's testimony of "Rab's" presence at the door of the Shore apartment. Third, the trial court observed that Karen's "own sister's ac-

count differed from her's," but the trial court failed to point out wherein their testimony is contradictory or in what manner Karen's testimony of "Rab's" threats "was not credible."

When the cause came on for trial on December 2, 1982, the day after "Bo" Burns' and "Rab" Shaffer's sympathetic or threatening visit to the defendant's home, the record reflects that the defendant again answered ready for trial, that the "State's witnesses were missing" and the trial was postponed on the State's motion to December 6, 1982. On December 6 and 7, the same circumstances prevailed. On December 9, the defendant waived trial by jury. Thereupon, a dialogue occurred before the court which unequivocally established that "Bo" Burns and "Blood" Bland were not the reluctant or recalcitrant State witnesses that they pretended to be. In fact, this colloquy, coupled with their trial testimony, established that their professed sympathy for the defendant and their hesitancy as State's witnesses were nothing but a thinly veiled, but transparent, subterfuge, because when "Bo" Burns and "Blood" Bland appeared as "unwilling" witnesses, they brought with them a third volunteer witness, Andrew "Rab" Shaffer, another El Rukn street gang "foot soldier," about whom the prosecuting attorney knew nothing. In addition to bringing the prosecuting attorney this previously unknown witness, these three El Rukns also expediently brought with them belated, previously unrevealed and purportedly detrimental admissions of the defendant of: (1) the shooting; (2) the defendant's hiding of the victim's gun and the murder weapon; (3) their joint unsuccessful search efforts for both weapons; and (4) the defendant's convenient discarding of the murder shell casings in their presence in "Rab's" toilet. This colloquy is as follows:

"MR. MORRISSEY [assistant State's Attorney]: *** In our final investigation of this case yesterday afternoon, throughout the morning, *there is a possibility that we may be calling an additional witness. I just learned of this person very late yesterday afternoon and it became apparent this morning it may be necessary to call him, Andrew Shaffer.* He is not listed in any of the police reports.

\* \* \*

*He is here and he's available.*

He was present during certain events that transpired the following day. *** [H]is name, nor an account of anything he would testify to is not summarized in the police reports.

\* \* \*

*[T]here were certain statements attributed to the defendant witnessed by Andrew Shaffer as well as two other witnesses ["Bo"*

*Burns and "Blood" Bland.]* ***. Those statements were not evident in any of the reports or documents turned over to Ms. Lyon by way of discovery. ***. *Basically they are admissions of the defendant,* ***.

* * *

MS. LYON: There is no record anywhere of them having said they heard Steve Shore say anything, one way or the other, about his alleged participation in this crime.

* * *

MR. MORRISSEY [assistant State's Attorney]: *** *I just learned about them yesterday* *** really I didn't learn about the full scope of these statements until this morning *when I was able to sit down and interview both David ["Bo"] Burns and Chester ["Blood"] Bland.* *** I did not have the opportunity to talk to either of them until yesterday because for the simple reason they did not appear in response to the court's issued and my own issued subpoena.

*** *[T]he attorney for the defendant shows for her own reasons, to answer ready on this case from the time Steve Shore was arrested and brought into Branch 66 for preliminary hearing.*

* * *

*** Yesterday when I learned about it, it didn't even cross my mind I would be using a statement. It only became apparent to me this may be usable in a trial of this cause after I interviewed both David ["Bo"] Burns and Chester ["Blood"] Bland. ***.

THE COURT: *** We are talking about the statement of Mr. Bland?

MS. LYON: No. Allegedly, my client, according to a statement that has appeared for the first time. *My client allegedly said he did this crime to these three gentlemen the morning following the crime.*

THE COURT: Okay, and the three gentlemen, *Bland, Burns,* and who?

MR. MORRISSEY [assistant State's Attorney]: *Andrew Shaffer.*

* * *

MS. LYON: *** *[t]he police don't reflect such a statement. Nowhere in their answer is such a statement reflected.*

THE COURT: *** The State can, will be allowed to admit the statement." (Emphasis added.)

It is patently apparent from this foregoing colloquy that these three El Rukn street gang foot soldiers were not unwilling witnesses. Rather,

they were coy and zealous, but subtly endeavoring to convict the defendant.

The prosecuting attorney's opening statement was that the evidence would establish that on August 10, 1982, Steve Shore shot the victim in the presence of "Bo" Burns and "Blood" Bland, who came to the police station four days later and implicated the defendant.

The defense attorney's opening statement was that the description of the assailant to the police by the eyewitness, Ernest Wells, was not a description of the defendant, that Wells did not identify the defendant in the lineup as the assailant; that during the defendant's custodial interrogation from his arrest on August 13, 1982, to the preliminary hearing on August 16, 1982, the defendant "consistently maintained his innocence," that in their interview of "Blood" Bland, he told the defense attorney and her law clerk, Sosnowski, that if he told them what really happened that night he would be charged with perjury; and that "This is a case of some criminals, some El Rukn gang members who sought to put the blame for the crime on someone else. I don't know if they did or if they know who did. *** They had a few days to get their story together and they blamed Steve Shore. *** They did not make any statement to the police until August 16, which is some six days late. *** David Burns, also known as 'Bo,' was arrested, brought into the station and he made a statement against Steve Shore *** because he did not want to get the case himself."

The defense attorney on cross-examination of the State's witnesses pursued the defense course outlined in her opening statement. "Bo" Burns and "Blood" Bland testified on direct examination that the defendant departed their company on the west side of Drexel Boulevard, crossed to the east side of Drexel, shot the deceased, took the deceased's gun, returned to the west side of Drexel, ran past "Bo" Burns and "Blood" Bland at 4014 South Drexel, with the pistol in his hand, to 4040 South Drexel and "[t]hrough the projects." The numerous contradictions and inconsistencies between Burns' and Bland's testimony were set forth in chart form in the defendant's brief before this court. These contradictions need not be here reiterated.

Eyewitness Ernest Wells' version was notably different from Burns' and Bland's version. Wells testified that after the shooting the assailant joined an accomplice on the west side of Drexel and that "they both started running together." This is not "Bo" Burns' or "Blood" Bland's version, and this court is exceedingly generous, to say the least, in attempting to reconcile this testimonial conflict by relying on the fact that "neither Burns nor Bland was asked whether defendant fled the area alone." It could be persuasively argued that Burns' and Bland's version

established that the assailant ran past them and fled "alone" into the housing project, without any further testimonial clarification from them. It could be just as persuasively argued that the assistant State's Attorney shied away from further inquiry of his two witnesses in this area for fear of further contradictions in their testimony.

"Bo" Burns testified further on direct examination that after seeing the defendant run through the project, he, Burns, proceeded to the Regency Lounge, a tavern at 41st Street and Cottage Grove, and while there he saw Steve Shore again riding on a bike.

This "bike" testimony takes on a special significance when the defendant's post-verdict testimony, hereafter set forth, is considered. "Blood" Bland's "bike" testimony on direct examination is as follows:

"Q. Who was there when he passed you, who were you with?
A. Me, Burns, and Willie.
Q. Did Steve say anything as he passed you?
A. I didn't hear him say anything.
Q. What did you do as Steve passed you?
A. I started walking south towards the projects.
Q. Who were you with. Were you alone or with someone?
A. I was with Burns.
Q. Then what is the next thing that happened?
A. I seen Steve in the projects.
Q. Where did you see him in the projects?
A. On the west side of the building.
Q. Was he walking, in a car, or what?
A. He was getting on a bike."

"Blood" Bland testified on direct examination that he and "Bo" Burns spent the night with Andrew Shaffer and that the following morning the defendant came by Shaffer's home, told them that he had put one gun in a red container and had thrown the other gun under a car or some bushes; that they, Bland, Burns, Shaffer and the defendant, went to "42nd Street through the alley," that he, "Blood" Bland, did not find or look for a pistol and that Bland, Burns and Shaffer left the defendant there to look for the pistols. Bland's further direct testimony was that later that day the defendant came to Shaffer's mother's home and told him that he had found one pistol, which the defendant showed him, along with two fired bullets or cartridges, which the defendant put in the toilet.

"Bo" Burns' direct testimony was that the defendant came by Andrew Shaffer's home the morning following the shooting and admitted to him, Burns, Bland and Shaffer that he "killed this chump," and that the defendant said "he don't know where he threw the pistol. He said he

threw one in a red container and the murder weapon he said he hid under some wood." Burns further stated on direct examination that the four of them went to the area of "43rd and Langley," that later he saw the defendant at Shaffer's mother's house, at which time the defendant had the .38-pistol, which he opened, took out two fired cartridges, flushed them "down the commode and took the gun with him and left."

Neither Burns nor Bland ever mentioned these post-homicide incidents inculpating the defendant at any time during their extensive interrogations and interviews by the police on August 14, 1982, when they initially "put the case" on Steve Shore. As before stated, the victim's gun had not been found in a "red container." The very first time these post-homicide episodes are mentioned by Burns and Bland is when they appear on the morning of the trial, December 9, 1982, with their newly discovered El Rukn foot soldier compatriot, "Rab" Shaffer. It involves no difficulty to conclude that these dramatically incriminating episodes were contrived.

This court endeavors to explain and justify Bland's and Burns' protracted silence on these post-homicide, inculpating episodes by stating "there is nothing in the record here indicating that either witness was questioned concerning those matters. In view of their testimony that they wanted no involvement with the police *** we do not believe it likely that either Burns or Bland would have volunteered any information not specifically requested by the police." This explanation is unsatisfactory. The fact that the record is silent on Bland and Burns' being questioned on "these matters" establishes simply that the record is silent on the matter. Second, having been told by the police that Steve Shore tried to give the case to "Bo" Burns, it seems Burns would not have hesitated but would have been adamant in immediately telling the officers of Steve Shore's post-homicide inculpatory admissions and conduct. Third, the officers' initial protracted interrogation of Burns and Bland would have elicited from them information about these incidents had they occurred. Fourth, the officers could not possibly have known to request information concealed by the three El Rukns and about which the officers had no knowledge. Fifth, if they were such reluctant witnesses, how then was the assistant State's Attorney so readily able to obtain such previously unrevealed, volunteered information from them, when they were no longer threatened with being charged with the murder, and when the police were unable to acquire this same information from them even under the threat of the murder charge? Moreover, "Rab" Shaffer was added as a last-minute witness, immediately before trial, but he was not called as a witness by the State to substantiate these extremely tardy post-homicide admissions and actions of the defendant.

More importantly, however, the conglomerate testimony of "Bo" Burns and "Blood" Bland that the defendant shot the deceased to rob him of his gun, that the defendant hid both guns, one in a red container, at unknown locations, and then told Burns and Bland about it the next day, solicited their unsuccessful aid in finding the weapons, and finally returned to their presence with the murder weapon, flushed the two murder shell casings down the commode and promptly departed their company is ludicrous, far-fetched, unreasonable and unworthy of belief. As defense counsel so convincingly argued, their reluctance to be witnesses might just have well been occasioned by their knowledge of the defendant's innocence, and/or their own commission of or involvement in the homicide.

"Bo" Burns, "Blood" Bland and Myra Sexton concluded their testimony on December 9, 1982. The trial was continued to the following day, at which time there was a cause-of-death stipulation. The trial was postponed to December 16, 1982, and then to December 22, when Paulette Jones testified that she found the victim's gun in a "red container" on August 22, 1982. The State rested, and the court heard arguments in support of and in opposition to the defendant's motion for a not-guilty finding, which the court denied. Thereupon, the defendant called Ernest Wells, the eyewitness to the homicide, and Karen Shore and Laydia Shore, the defendant's sisters, each of whom testified as previously set forth. Various stipulations were entered into, and thereafter Sosnowski testified, also as previously set forth. The defense rested, and the State offered no rebuttal testimony. The court heard closing arguments and postponed making a finding to January 6, 1983, on which date the court found the defendant guilty of felony murder. The court set hearing of post-trial motions for January 13, 1983, on which date the motions were reset for February 28, 1983.

On February 28, 1983, defense attorney Lyon presented a motion to reopen the evidence, which in part stated:

"Certain evidence was not presented at trial. This evidence was not presented because both counsel and Mr. Shore were afraid for his life. He has been threatened both in and out of jail, his family has been threatened, and he has been beaten in jail. The threats are that if he told what he saw he will be killed by the El Rukins."

The motion was signed by attorney Lyon, but the source of her information was not revealed. The trial judge entered and continued the defendant's motion to reopen to March 8, 1983, and in so doing advised attorney Lyon, "You might want to go ahead and submit an affidavit to back up what you have as to what your client is going to be saying."

On March 8, 1983, attorney Lyon filed the defendant's affidavit, the pertinent parts of which are as follows:

"2. I did not testify at my trial in this cause because I was told to keep quiet or I and my family would be harmed or killed. The threat was made by David 'Bo' Burns and 'Rab' Shaffer. The first threat was made before my arrest. There have been several since.

3. The reason I was threatened is simple. I did not shoot Garrison Hester. I was riding my bicycle south on Drexel Boulevard heading home shortly after midnight on August 10, 1982. I heard two shots from the other side of the street, and saw a man running across the median strip with a gun in his hand. He joined up with a second man and ran away. I recognized the first man. He is Davis 'Bo' Burns. He recognized me because we live in the same neighborhood although we are not friends or associates. He is an El Rukin. I am not.

4. I did not tell the police this because I was afraid the El Rukins would kill me. *I did not even tell Ms. Lyon this until we had already begun trial for the same reason.*" (Emphasis added.)

The defendant's revelations to his attorney constituted attorney-client privileged communications. But whether the defendant was aware of and knowingly waived the privilege by submission of his affidavit need not be here decided.

On presentation of the defendant's affidavit, attorney Lyon stated:

"As to the good cause and reason as to why this evidence was not presented at trial, I would like to say two things. First of all, Mr. Shore's very real fear of reprisals against him by the members of the gang to which the State's witnesses in this case belong, or belonged, if you believe that they all quit. The second reason, your Honor, is a little more complicated, and I'm not really sure if I'm approaching this correctly in discussing it at this point, but I will do so. The second reason is because Steve Shore was so afraid of these people, that not only did he not talk to the police about what he saw that night, but *he didn't talk to me about what he saw that night until after a jury waiver had been executed and the trial began.* \*\*\* [H]e is very much afraid, his family has been threatened and assaulted, he has been assaulted in the jail, and he is very much afraid." (Emphasis added.)

It is quite apparent from the foregoing that attorney Lyon recognized the possibility that her remarks might constitute an infraction of the attorney-client communication privilege. Indeed, she was in a delicate predicament.

The State opposed defendant's motion to reopen. Attorney Lyon re-

sponded:

> "*** I know this is awkward, I feel awkward right now, I feel very awkward because *my client was so afraid of this whole situation that he did not confide in me until he cracked, frankly, he cracked during the trial, and fell apart and told me what happened.*" (Emphasis added.)

Understandably, attorney Lyon was in an "awkward" predicament in revealing to the court and the State her client's privileged communication, in spite of her unquestionably benevolent motive. Again, whether the defendant knowingly waived the attorney-client privilege need not be here determined. The trial judge decided to receive evidence on the motion to reopen as an offer of proof. In so doing, he expressly noted:

> "Here I note that the defendant, after the testimony of the two eyewitnesses that testified *** he would have *** asked for a continuance, I could easily see granting him a continuance *if it were told to me for the first time that after listening he decided to confide a little bit more with his attorney.* But here the defendant just sat through all of the testimony, the court took a date to go ahead and evaluate the evidence, and look carefully through it, and the defendant didn't do anything." (Emphasis added.)

Thereupon the trial judge set the cause for March 17, 1983, "for an offer of proof under oath."

Robert Lee Clark and the defendant testified on the "offer of proof under oath" on March 17, 1983. They both stated that on August 10, 1982, shortly after midnight they were riding their bikes at 40th and Drexel. It would appear to be more than mere irony that both "Bo" Burns and "Blood" Bland testified that the defendant appeared (suddenly out of nowhere) on a bike after the deceased was shot, which was preceded by an evening of drinking wine and smoking dope with the defendant.

Clark and the defendant testified further that while riding their bikes they heard two shots and then saw a man running with a gun in his hand, that he was joined by another man and they both ran off. Clark testified that he did not know either man, that he did not tell the police what he had seen "[b]ecause I was afraid because I know what those studs would do to me if I would go to the police and tell." The defendant identified the man with the gun in his hand as Dave Burns, whom he did not know personally but had seen in the neighborhood. The defendant testified further that Burns pointed at him and said something to the other man, who also pointed at him and the two men ran toward the (housing) project. The defendant stated that he went home, that he did not shoot the deceased and that on the following morning at "Rab's"

house he did not show a gun to "Rab," David Burns or Chester Bland. It was the defendant's further testimony that the next day he went to a lounge for cigarettes for his mother and "the taller guy and his friend asked him if he saw anything and told him if he said anything to anybody about it he would find himself in the morgue and he told them that he didn't see anything." He testified further on redirect examination:

> "Q. Steve, you didn't tell me anything about hearing shots until after the trial began, is that correct?

> \* \* \*

> A. Yes, ma'am.
> Q. Why not?

> \* \* \*

> A. Because I was scared to tell what I seen because of what they told me and I know what they told me and I know what these people do to people and I have heard and I know of people, what they do to them and my family got threatened and I got tired and I didn't feel all this was going to happen to me, I just wanted to go ahead and let it all be over with and leave it alone, I didn't want to hurt nobody. \*\*\* I didn't want to have nothing to do with this."

In arguing to the trial judge to open the proofs and accept the foregoing testimony of Clark and the defendant that was presented on the offer of proof, attorney Lyon declared:

> "He [defendant] should have said to the police detectives I'm scared to death, I'm terrified, these guys threatened me, threatened my family. \*\*\* The young man was afraid and *he was so afraid it warped his judgment. God knows he should have told me, there is no question about it.*" (Emphasis added.)

Attorney Lyon further argued:

> "*I am personally convinced of my client's innocence* and I know that that is not evidence and their objection is correct. \*\*\* I am speaking to you as a professional and *it is a personal plea too* \*\*\*." (Emphasis added.)

The trial judge took the offer of proof under advisement and postponed the proceedings to March 24, 1983, to rule on the offer of proof.

On March 24, 1983, the trial judge made the following comments and ruling:

> "[E]ven though the testimony in this case is over prior to Christmas, defendant per his attorney, first tells her about another account at Christmastime. Even though the case is set for decision on January 6, 1983, no motion to reopen the proofs is filed or requested.

*After a finding of guilty defendant's attorney then first makes a motion to reopen proofs concerning an account that the defendant told her at Christmastime.* Defendant's attorney in her argument in response to the hearing on the motion to reopen proofs on March 17, 1983, even though she states that it is improper for an attorney to indicate what she personally believes, *she indicates that she believes that the defendant is innocent.* This, even though that *the defendant has been far from candid with even his own attorney.*

An attorney's beliefs are improper in argument, and I hope that I don't hear what any attorney's beliefs are in this courtroom again.

\* \* \*

There is no question in my mind that Burns and Bland did not want to testify against the defendant in this case. *Defendant never thought they would come forward, which is one reason I suspect there was a demand for trial from the date that this case came to my call.*

\* \* \*

The motion to reopen proofs is hereby denied. The evidence here was not inadvertently overlooked. Defendant knew what the evidence was against him all along the way. When he finally saw what dynamite the State had against him *he apparently started to worry and told his attorney at Christmastime another account of what happened.* Nothing is done, \*\*\*. Instead, the trial court was allowed to give its findings without objection or even a hint that further testimony was being considered. *Defendant wanted his cake and he wanted to eat it, also.* In effect, what was done here is called laches, lack of diligence. \*\*\* *If I admitted the offer of proof my decision would remain the same.* The felony murder finding of guilty stands." (Emphasis added.)

If the defendant "wanted his cake and he wanted to eat it, also," the trial judge refused to allow him to do so. Instead, it was the trial judge who "wanted his cake and he wanted to eat it, also," and in fact did so repeatedly.

First, the trial judge heard Clark's and the defendant's testimony on the offer of proof on the defendant's motion to reopen the proofs, and then relied on that testimony and the defendant's lack of credibility in denying the motion. Second, the trial judge relied on the defendant's relationship with his attorney in adversely assessing his credibility. Yet, the defendant's attorney vowed to the court her personal confidence in the defendant's credibility, her belief of the defendant's fears and her assur-

edness of the defendant's innocence.

Third, the trial judge resoundingly condemned the defense attorney for expressing and injecting her personal beliefs of the defendant's innocence into the case. The trial judge then expressly relied on the defendant's privileged communications to his attorney in determining the defendant's credibility and his basis for disbelieving the defendant's testimony. To have done so was plain error. The propriety of the disclosure of privileged attorney-client communications and waiver of the privilege need not therefore be further discussed or decided.

Fourth, the trial judge simultaneously held that "[i]f I admitted the offer of proof my decision would be the same." The trial judge, by the means stated, miraculously "kept his cake and ate it also," which he had successfully precluded the defendant from accomplishing, if such was the defendant's intent.

A mere cursory examination and analysis of the trial judge's comments, findings and ruling clearly reveal that the trial judge committed plain error. It was manifestly improper for the trial judge to have allowed the defendant's demand for trial to have played any role in his decision on the defendant's offer of proof or on the defendant's motion to reopen the evidence. The trial judge obviously did so, as revealed by his statement that because Burns and Bland were reluctant witnesses, the court thought, *"is one reason I suspect there was a demand for trial from the date this case came on my call."* (Emphasis added.)

This court's treatment of this issue in effect avoids the issue. This court merely points out that "there is further support for the [trial] court's conclusion that he [defendant] did not believe the State had sufficient evidence to convict him and therefore chose to immediately proceed to trial." This artistry circumvents the gross impropriety of the trial judge's reliance, however negligible, on a defendant's trial demand in evaluating and determining the defendant's credibility.

The trial judge was unjustified in its cavalier rejection of the defendant's testimony of his fears. It is common knowledge that street gang violence is rampant in the Chicago area. Moreover, the defendant initially implicated "Bo" Burns in the homicide to the police. It could be reasonably inferred that his fear prohibited him from further expanding on his knowledge of Burns' involvement to the police. Thus, Burns was thereby enabled to manipulate himself from accused to accuser. In addition, it was not the defendant who invited Burns and "Rab" Shaffer to his mother's home on December 1, 1982, whether to express their sympathy or espouse their threats. No one invited them. The defendant was in custody at the time awaiting trial. Not only that, if the defendant committed the homicide, his testimony on the offer of proof of hearing

shots and seeing Burns with a gun, join another man and flee the scene was concocted, and thus, it was not out of fear of gang reprisal that motivated him to withhold his concoction from his lawyer. In that event he would have had no reluctance to immediately reveal his concoction to his attorney. The trial judge's reasoning in evaluating and rejecting the testimony of Clark and the defendant on the offer of proof was unacceptable.

A far more grievous error was committed by the trial judge when he determined the defendant's lack of credibility on the offer of proof and denied defendant's motion to reopen the proofs on the mistaken, grossly erroneous and evidentiary unsupported conclusion that the defendant *"told his attorney* at Christmastime *another account of what happened"* and *"the defendant has been far from candid with even his own attorney."* (Emphasis added.) A thorough and meticulous search of the entire record utterly fails to disclose that what the defendant "told his attorney at Christmastime" was another or different account of what he had previously told his attorney. Nowhere in the entire record is there revealed that the defendant previously told his attorney an account of what happened that was different than the account he related to her during the trial at Christmas. Nor is there any evidentiary support for the trial judge's naked assertion *"that the defendant has been far from candid with even his own attorney."* (Emphasis added.)

From the complete record, all that appears is that the defendant denied commission of the homicide to the police, his lawyer and to the trial judge, and that he was afraid to tell even his own lawyer what he had seen. The record is also completely silent on whether he told his attorney prior to trial that it was his fear that prompted him to withhold his observations from her. It can be reasonably inferred from the record that he informed her that he was afraid to tell her what he knew, and it can be just as reasonably inferred from the record that he did not. Nevertheless, revelation or nondisclosure of his fear to his attorney, or revelation or nondisclosure of what he had seen after the trial had commenced is a far cry from telling "his attorney at Christmastime another account of what happened," as the trial court found. And if the defendant had in fact told his attorney that because of his fear of gang reprisals he would not tell her what he knew, on which subject the record is totally silent, then there is likewise no basis in this record for the trial judge's conclusion "that the defendant has been far from candid with even his own attorney." Because of the trial court's erroneous and evidentiary unsupported conclusions on such crucial issues in this case, the plain-error doctrine is unavoidably applicable.

Defense counsel did not object to the trial court's reliance on the attorney-client privileged communications in determining the defendant's

credibility, or more accurately, his lack of credibility. Nor did defense counsel object to the trial judge's findings that the defendant told defense counsel "another account of what happened" and had "been far from candid with even his own attorney," although such findings were not supported by any evidence or facts in the record. Nor has defense counsel assigned this erroneous conduct by the trial judge for reversal before this court. Supreme Court Rule 615 (73 Ill. 2d R. 615(a)) provides, however, that on appeal "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

This rule and the plain-error doctrine were applied in *People v. Benniefield* (1980), 88 Ill. App. 3d 150, 410 N.E.2d 455, in which six eyewitnesses testified that the defendant and the deceased argued during a gambling game, that the defendant departed, and that shortly thereafter the defendant returned and gunned down the deceased. The defendant's version was that the deceased and several of the State's eyewitnesses chased him and that he shot the deceased in self-defense. On cross-examination, the defendant denied that he had testified at a prior hearing that he had been chased by the State's witnesses. It was not revealed to the jury or the trial judge that the prior hearing, about which inquiry was made of the defendant on cross-examination, was a plea bargaining proceeding, the evidence of which was inadmissible under Supreme Court Rule 402(a) (73 Ill. 2d R. 402(a)). Defense counsel failed to assert Rule 402 as a basis for his objection to this cross-examination, nor did he rely on this cross-examination in his post-trial motions. On review, the court held:

> "Notwithstanding the above, the defendant claims it was plain error for the trial court to allow impeachment by the use of a plea discussion. Supreme Court Rule 615 (Ill. Rev. Stat. 1977, ch. 110A, par. 615) provides that plain errors affecting substantial rights may be noticed although they were not brought to the attention of the trial court. The exercise of this option is discretionary by the reviewing court (*People v. Fleming* (1964), 54 Ill. App. 2d 457, 203 N.E.2d 716), depending on the closeness of the case, the conduct of the trial judge, the extent to which the error may have contributed to the verdict, and the magnitude of the error alleged. *People v. Lagardo* (1967), 82 Ill. App. 2d 119, 226 N.E.2d 492; *People v. Jones* (1971), 131 Ill. App. 2d 361, 268 N.E.2d 248.
>
> * * *
>
> [W]e are justified in noticing the error as plain error under Supreme Court Rule 615. Accordingly, defendant's conviction is reversed and the cause will be remanded for a new trial." *People v.*

*Benniefield* (1980), 88 Ill. App. 3d 150, 155-56.

Supreme Court Rule 615 was previously embodied in identical language in section 121—9(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1963, ch. 38, sec. 121—9(a)), which was applied in *People v. Lagardo* (1967), 82 Ill. App. 2d 119, 226 N.E.2d 492. In *Lagardo,* the jury found the defendant guilty of theft on evidence that shortly after the victim's home was burglarized, the victim's property that was taken in the burglary was found in the defendant's home. The trial judge denied the defendant's pretrial motion for a change of venue and substitution of judges, which the defendant failed to assign as a ground for a new trial. Although the guilty finding was based on a jury verdict, the appellate court reversed and held:

"Our Code of Criminal Procedure, section 121—9(a), dealing with causes on appeal, states:

Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. [Ill. Rev. Stats. (1963), c 38, sec. 121—9(a)] [now Supreme Court Rule 615(a) (73 Ill. 2d R. 615(a))].

While the general rule is that nonjurisdictional matters not included in a defendant's motion for a new trial are deemed to have been waived and therefore not subject to review, section 121—9(a) of the Code of Criminal Procedure has codified an exception to that general rule in instances where the alleged defect is patent, and it affects substantial rights to the satisfaction of the reviewing court in the exercise of their discretionary powers. Briefly, it may be said that the pivotal factors to be considered to determine whether or not an exercise of such discretion is warranted are, the closeness of the case, the conduct of the trial judge, the extent to which questionable evidence may have contributed to a guilty verdict, the fairness of the trial in general, and the magnitude of the errors alleged. *** We feel that the circumstances attendant on the proceedings below warrant an exercise of such discretion to review the propriety of the trial judge's denial of a hearing on the aforementioned pretrial motions." *People v. Lagardo* (1967), 82 Ill. App. 2d 119, 123-24.

In the case at bar, the trial judge's defects affect patent and substantial rights. Each of the pivotal factors, set forth in *Lagardo,* are present here. These factors are: (1) the closeness of the case; (2) the conduct of the trial judge; (3) questionable evidence which may have contributed to the trial court's findings and rulings (there was no such evidence in the instant case); and (4) the fairness of the trial in general. Application of Supreme Court Rule 615 is therefore not only warranted but indeed is

demanded.

In *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827, the jury found the defendant guilty of murder and aggravated battery. The prosecuting attorney made inflammatory remarks to the jury in closing argument. The reviewing court reversed and held:

> "It is conceded by the defendant that none of the prosecutor's remarks was objected to at trial, nor were contentions of error regarding them included in post-trial motions. 'In criminal cases in which the evidence is closely balanced, [our Supreme Court] has held that [we] may consider errors that have not been properly preserved for review.' (*People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856.) In a case such as this, where the evidence of guilt was conflicting, the statements by the prosecutor which we have found to constitute error 'affected substantial rights of the defendant and consequently they are considered in this appeal under the " 'plain error' " doctrine.' *** For the same reason, these errors cannot be ruled harmless on the record." 93 Ill. App. 3d 808, 824-25.

For the foregoing reasons, I submit that the defendant's murder conviction should be reversed and the cause should be remanded for a new trial.