THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES HOUSBY, Defendant-Appellant.

(No. 73-230;

Third District—March 14, 1975.

*Rehearing denied March 31, 1975.*

94

Robert Agostinelli and James Geis, both of the State Appellate Defender's Office, of Ottawa, for appellant.

Frank Yackley, State's Attorney, of Ottawa (Michael Weinstein and F. Stewart Merdian, Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant, James Housby, appeals from a judgment of the Circuit Court of LaSalle County finding him guilty of the charge of burglary as a result of which he was sentenced to a term of from 3 to 9 years in the penitentiary. He was charged with the crimes of burglary and grand theft (Ill. Rev. Stat. 1973, ch. 38, pars. 19—1 and 16—1(a)). On appeal in this court, defendant contends (a) that his motion to suppress certain evidence was wrongfully denied; (b) that the court erred in denying his request to reopen the case during jury deliberations; and (c) that his sentence is excessive and arbitrary.

It is shown by the record that around 1 A.M. on the morning of February 2, 1972, LaSalle City Police Officers Kostellic and Riordan were on patrol at the east end of the city. While they were passing the Alpha Cement Quarry, which was recently shut down, the policemen noticed an automobile which was apparently abandoned. When they stopped to investigate they found Lorraine Moreno, who told them the car was out of gas and that her boyfriend had gone to get some. The officers then

noticed some tracks in the fallen snow which led to the quarry. Moments later they found some copper "bus bars" stacked up just outside the quarry fence, near the automobile, and also found other bars inside the fence.

After noting these items, the officers radioed for assistance and placed Miss Moreno under arrest. Kostellic and Chief Kinczewski investigated further and found that the copper bars had been taken out of a substation on the quarry grounds. The two officers also found fresh footprints in the snow leading toward the center of the city, and they began to track the prints.

In the meantime, Officer Potthoff heard over the police radio that two suspects named Housby and Seibach were being sought in connection with the burglary on the east side of the city. Potthoff was patrolling on the west side of the city, about a mile from the quarry, in the business district. About 1 A.M. he saw defendant and another man crossing the street. He asked their names. When they replied "Housby and Seibach," Potthoff arrested them and notified the other officers.

Defendant and his companion, David Seibach, were taken to the police station while Officer Kostellic backtracked their footprints from the point of arrest to the point he and the police chief had reached when Potthoff called in his arrest. At the police station, police took defendant's boots to be compared with the footprints in the snow and also took his jacket for the purpose of comparing cement dust on it to dust on the floor of the burglarized substation.

Seibach pleaded guilty to the theft charge after being indicted with defendant and Miss Moreno. He testified at the trial that he and defendant and a third person were talking one day in a tavern when defendant mentioned that it would be a "pretty easy job" to steal copper from the quarry. Later that day, Seibach said, the three men went to the quarry and prepared some of the copper bars to be hauled away. The next night, Seibach and defendant went to the quarry accompanied by Miss Moreno, and attempted to carry off the bars. They were interrupted, however, by the arrival of Officers Kostellic and Riordan. The two men managed to escape from the premises while the officers were questioning Miss Moreno. Seibach said they went to defendant's house for a short time and then headed for a friend's house to set up an alibi, but were apprehended by Officer Potthoff on their way.

Defendant first contends that his pretrial motion to suppress the evidence, on the ground that it was not seized pursuant to a warrant or lawful arrest, was wrongfully denied by the trial court. He argues that Officer Potthoff had no authority to detain him on the street for questioning.

■■ It is noted that the officer simply asked the names of the parties, and when he determined that they were the persons who were being sought he placed them under arrest. Temporary questioning, often called a "stop," is permitted according to the dictates of *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968). This rule is codified in section 107—14 of the Code of Criminal Procedure (Ill. Rev. Stat. 1971, ch. 38, par. 107—14). Under the terms of the statute, an officer may question a suspect in a public place for a brief time when he "reasonably infers from the circumstances that the person * * * has committed an offense * * *." (Cf. *People v. Ussery*, 24 Ill.App.3d 864, 321 N.E.2d 718 (3rd Dist. 1975), in which we quoted language from *People v. Howlett*, 1 Ill.App.3d 906 (1971), which, in turn, quoted from *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968), to the effect that a police officer may, in appropriate circumstances approach a person for purposes of investigating possible criminal behavior.) Defendant notes that when Potthoff stopped the two men, he knew only that a burglary had been reported a mile away and that two male suspects named Housby and Seibach were being sought. Defendant contends that this is not a basis to "reasonably infer" that the men had committed an offense.

■■ The State replies that merely questioning persons on the street as to their names is not a "stop" and cites cases where a suspect is called over to a squad car and such action was ruled not sufficient restraint to be a "stop." *People v. Ortiz*, 18 Ill.App.3d 431, 305 N.E.2d 418 (1st Dist. 1973); *People v. McGarry*, 10 Ill.App.3d 570, 294 N.E.2d 718 (1st Dist. 1973; cf. *People v. Howlett*, 1 Ill.App.3d 906, 274 N.E.2d 885 (1st Dist. 1971).) We conclude that even if the incident was a "stop" under section 107—14, the officer was justified in so acting. It is notable that in addition to being advised that two male suspects were being sought for committing a burglary in the last hour about a mile away, with their names broadcast, Potthoff also saw the two men walking in the business area at 1 A.M. when all the stores were closed and it was snowing. The circumstances were obviously sufficient to allow the officer to briefly question the men.

Defendant contends also that Potthoff had no grounds to make an arrest when he found out the men's names and contends that the testimony indicated that no broadcast of the names Housby and Seibach was made. This conclusion was based on the assumption that only Kostellic talked to Miss Moreno and that only she could have provided the names. Yet Kostellic testified that he did not learn the names of the suspects until after Potthoff made the arrest. Kostellic was busy with his investigation. Several law enforcement officers were present other than Kostellic around Miss Moreno after the arrest, and there was no testimony that Kostellic was the only one who talked to Miss Moreno. The testimony of

Officer Potthoff that the broadcast was in fact made was not contradicted in any manner. It was noted also that the officers had radioed in the license number of the car near the quarry the moment they noticed it. As far as the record is concerned, there is no basis to doubt the sworn testimony of Officer Potthoff that he heard the broadcast naming Housby and Seibach as suspects.

██ Defendant contends that even if Potthoff heard such broadcast, he still did not have probable cause to arrest the men when he found out their names. He cited *Whiteley v. Warden*, 401 U.S. 560, 28 L.Ed.2d 306, 91 S.Ct. 1031 (1971), where defendant contested his arrest based upon a broadcast. Defendant here, however, did not attack the admissibility of the clothing on the grounds now raised on appeal. Defense counsel instead attacked the seizure without warrant on the basis that there was plenty of time to obtain a warrant and no great necessity to take defendant's jacket and boots immediately. This was the basis upon which the court ruled, finding "sufficient need here to preserve what evidence would be on those clothes to justify the seizure without a warrant." Since the defendant did not raise the issue which would bring it within the scope of the *Whiteley* case, and thus give the State a chance to show the basis for the broadcast and by whom it was made, we find that defendant has waived the issue and may not now raise it on appeal.

Defendant next contends that the court erred in denying his request to reopen the case while the jury was deliberating. He argues that the trial judge erroneously thought that he had no discretion in the matter and denied the request on such basis. The record here discloses that defendant rested his case without presenting any evidence or testifying himself on his behalf. Then, apparently as the jury was ready to return to the courtroom and announce its verdict, defendant suddenly addressed the court and requested "to take the stand and present witnesses." He said that he had not testified on advice of his appointed counsel but he wanted to clear up "dishonest parts of that statement." The court immediately responded that the motion was untimely, that the proofs were closed, that defendant had rested without testifying or calling witnesses as was his prerogative, and that the jury had considered the evidence and was ready to render its decision.

██ While there is error when a trial court refuses to exercise its discretion in the erroneous belief that it has no discretion as to the question presented (*People v. Queen*, 56 Ill.2d 560, 565, 310 N.E.2d 166 (1974)), we do not find this situation in the cause before us. While the court may have discretion to reopen the proofs at any time before the verdict is rendered (*People v. Mackey*, 30 Ill.2d 190, 195 N.E.2d 636 (1964)), still there must be some prejudice shown by defendant because

of the determination not to reopen. We find none shown in the record in the cause before us.

■■■ While the court has discretion to reopen the proofs, in the interest of fairness and justice, the integrity of the judicial system demands that such discretion be exercised only where necessary. As the jury draws closer to a verdict, the reasons mount against reopening the case. The party seeking to reopen the case bears the burden of showing sufficient reason. (See the well-considered opinion on this issue in *People v. Olsen*, 34 N.Y.2d 349, 313 N.E.2d 782, 784-5 (1974).) There was no indication from defendant as to what evidence and testimony he wished to present. We find no prejudice to defendant in the failure of the court to reopen the case once it was close to the point when the jury was ready to announce its verdict. It is our conclusion that the court properly exercised its discretion on this issue.

■■■ A final issue is raised by defendant in his contention that the sentence received by him of 3 to 9 years in the penitentiary was excessive and arbitrary. He contends that it is excessive because of the nonviolent nature of the crime and the fact that the quarry had been closed down for some time. (Cf. *People v. Moore*, 133 Ill.App.2d 827, 272 N.E.2d 270 (1971).) The quarry, however, did still have a night watchman and had valuable property stored there. Defendant was a once-convicted burglar with other misdemeanor convictions. He had failed to satisfactorily serve a probation term for his first burglary. It also appears that defendant had no real ties to the community. Defendant also contends that the sentence is arbitrary because his two accomplices both received probation, and that he is being punished because he exercised his right to trial and they pleaded guilty. It is noted that the accomplices were both younger and had considerably less of a police record. Seibach also testified that defendant was the instigator of the burglary. The accomplices pleaded guilty to theft while defendant was convicted of burglary, a more serious offense. In view of the record we cannot conclude that the trial court abused its discretion in imposing the sentence upon defendant.

For the reasons stated, the judgment and sentence of the trial court is, therefore, affirmed.

Affirmed.

STENGEL and BARRY, JJ., concur.