THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN FORD, Defendant-Appellant.

Fifth District   No. 5—84—0294

Opinion filed December 18, 1985.

William C. Evers III, of Collinsville, for appellant.

John Baricevic, State's Attorney, of Belleville (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

The defendant, John Ford, was convicted in a bench trial of rape and indecent liberties with a child and was sentenced to six years' imprisonment in the Department of Corrections. On appeal the defendant contends (1) that the State should not have been allowed to reopen its case, (2) that the victim's brother was not shown to be competent to testify, (3) that the court allowed improper testimony from witnesses regarding statements made to them by the victim and her brother, (4) that the State failed to prove the defendant's guilt beyond a reasonable doubt, and (5) that the sentence imposed was excessive. We affirm.

The minor victim was eight years old at the time of the alleged incident and 10 years old at the time of trial on January 25, 1984. During the period from December 1981 through January 1982, she lived in a two-bedroom trailer with her mother, her brother, and the defendant, her mother's boyfriend, who was 50 years old at the time of trial. The alleged incident occurred on January 1, 1982, while the victim's mother was at work and the victim and her six-year-old brother were at home with the defendant. The victim testified at trial regarding the details of the occurrence, during which the defendant

allegedly forced the victim to have sexual intercourse with him and to perform acts of oral sex. The victim stated that while this was occurring her brother stood against the door, watching and "kind of like giggling." When the victim's mother returned home from work, the victim told her what had happened, and the mother called the victim's grandmother, who later came and took the children home with her.

On cross-examination the victim stated that the defendant and her mother got into a fight after her mother arrived home and that the defendant "started beating up on her [the victim's mother]." The victim did not know how long the fight lasted, but her mother called the children's grandmother "right after [the defendant] left." In response to questioning the victim stated that this was "on [that] same day" and that her mother was not working that day but was out, possibly with a friend. The victim stated that she was afraid of the defendant, even before the incident occurred, because "he whips us hard," on one occasion leaving bruises on her and her brother's legs and arms after hitting them with a baseball bat. The victim stated that she did not like the defendant and did not like him before the incident occurred, although she got along with him pretty well until that time.

The victim's brother, Michael, who was eight years old at the time of trial, was allowed to testify over the defendant's objection. He described the defendant's act of intercourse with the victim in child's terms. He stated, however, that prior to the defendant's actions toward the victim, the defendant had told both him and his sister to take their clothes off and that he had been on the bed with the defendant and his sister during the occurrence.

The children's grandmother testified that their mother, her former daughter-in-law, had called her on Sunday, January 3, 1982, to come get the children "because they were put out of the house without any coats and she had been beat on." A few days after the children's arrival at their grandmother's home, the victim told her grandmother about the incident with the defendant, "that she had been touched" and "that he had did it to her." The grandmother contacted the authorities, and the victim later related the incident in greater detail to a case worker who came to the home. When asked on cross-examination if she had ever talked to Michael about the incident, the victim's grandmother stated that "Michael admitted to me, yes, that he saw it."

Dr. Shahnaz Ahmad, a pediatrician at Cardinal Glennon Hospital in St. Louis, testified that he examined the victim on January 22, 1982. He did not take her history because she was very nervous and scared and the nurses had already taken a detailed history. His exami-

nation revealed on outer vaginal area that was red and swollen and a ruptured hymen. The victim experienced pain so that the doctor could not use a speculum to examine her. Dr. Ahmad testified that it was his opinion that the victim had been sexually abused. He stated that symptoms such as the victim's would persist for four to six weeks after such abuse had occurred.

Debra Morgan, an agent with the Division of Criminal Investigation (DCI), testified that the victim had described the incident with the defendant in an interview with Ms. Morgan on January 19, 1982. Over the defendant's objection, Ms. Morgan stated that she had also had a conversation with the victim's brother Michael, during which he told her that he had observed the defendant touch the victim's breast and genital areas.

Janet Hessenhauer, a counselor at the Rape and Sexual Abuse Center, testified that the victim had related the incident with the defendant to her over the course of counselling sessions from April 1982 to March 1983. On cross-examination Ms. Hessenhauer stated that the victim had also told her of another instance of sexual molestation occurring a couple of years earlier. On this occasion a neighbor, who was also named John Ford, forced the victim to perform acts of oral sex on him and his son. The victim made it clear that this was a different John Ford and not the defendant.

The defendant testified on his own behalf that on Christmas Eve 1981, immediately prior to the alleged incident, he had spanked the victim with a belt for stealing his wallet. He stated that he did not spend the night of New Year's Eve at the trailer and that, when he got there the next morning, the children's mother was at work and the water lines had "froze up and busted." He called the mother at work, and she came home to help him with the lines, which took three to four hours. He then left for St. Louis, returning briefly the next morning to pick up some clothes before going back to St. Louis. He then returned to the trailer that afternoon after dark, about 7:30 or 8 on Saturday, January 2. The victim overheard him making a phone call to a woman in St. Louis, whom he had been with the previous two nights, and told her mother, after which he and the children's mother got into a bad fight. The defendant spent the night at the trailer, and the next morning the fighting resumed. The defendant testified that after a real "knock-down drag-out" fight that morning, Sunday, January 3, he left around 10 and had not seen the children since. He denied all of the allegations made against him by the victim.

On cross-examination the defendant stated that he was living with the victim's mother at the time of trial and that the only time he

hadn't lived with her since the alleged incident was during a six-month period in summer 1983.

The victim's mother, testifying for the defendant, stated that the relationship between the victim and the defendant prior to the alleged incident was "pretty bad" and that the victim would spit at the defendant when he corrected her and tell him that she hated him. The victim's mother reiterated the defendant's testimony regarding his whereabouts during the period in question. The victim's mother testified further that on December 31, 1981, she had caught her daughter having sexual intercourse with a 13- or 14-year-old boy in a shed at her babysitter's house. Three other boys were in the shed while it was happening, one of them her son, Michael. The victim's mother stated that after this incident, she discussed sex with her daughter and whipped her. She further stated that in October 1980, another John Ford, not the defendant, had tried to rape her and, when she resisted, had told her that he had "already tried screwing my daughter." The victim's mother testified that the victim had never told her that the defendant had molested her.

On cross-examination the victim's mother stated that she had not reported the incident of her daughter having intercourse in the shed when she was informed by the DCI agent that sexual abuse was suspected. She stated that this was the first time that she had ever mentioned to anyone connected with law enforcement that her daughter had been sexually active, although she had tried to tell the people from Children and Family Services and "nobody wanted to listen."

At the conclusion of this witness' testimony, the State offered no rebuttal testimony, and the court took the case under advisement. The following day, before the court had entered judgment, the State filed a motion to reopen the case to introduce additional evidence. The State's motion alleged that it had been made aware of evidence regarding the testimony of the victim's mother, that such information was previously unknown to it because of the mother's failure to mention her daughter's prior sexual activity in other court proceedings or in the investigation of the case, and that the State had made diligent efforts to investigate the case but had been provided with no information regarding the incident of prior sexual activity testified to by the mother. The court allowed the State's motion to reopen its case.

At the reopened proceeding the State presented testimony of two witnesses who had babysat with the victim and her brother while their mother was working. Sandy Ford testified that she had kept the children before October 1980 and that, to her knowledge, the only other person who ever babysat with them was Mary Jones, her ex-sis-

ter-in-law. Sandy Ford stated that she had not heard of any incident in which the victim was sexually involved with anyone from the neighborhood and that she would have known about it because "the children in the neighborhood talk, and I listen."

Mary Jones testified that she had babysat with the victim and her brother around the last part of 1981 and the first part of 1982. She stated that she had a shed in back of her house but that it was locked up and she never let children staying with her play in it. Mary Jones testified further that she had no knowledge of any sexual incident that had happened while she was babysitting. She had kept several other children while babysitting for the victim and her brother, including the children of Sandy Ford.

The court subsequently found the defendant guilty on the charges of rape and indecent liberties with a child and sentenced him to six years' imprisonment. The defendant has appealed from this conviction and sentence.

The defendant first contends that the trial court abused its discretion in allowing the State to reopen its case to present rebuttal testimony after the parties had rested and the court had taken the case under advisement. The defendant asserts further that the court's action was motivated by its bias in favor of the State as demonstrated by other rulings of the court during trial.

It is settled that the decision to permit a case to be reopened to receive additional evidence lies within the sound discretion of the trial court. (*People v. Padfield* (1974), 16 Ill. App. 3d 1011, 307 N.E.2d 183; *People v. Price* (1972), 8 Ill. App. 3d 158, 289 N.E.2d 280.) The State here sought to reopen its case to present testimony rebutting the testimony of the victim's mother that the victim had had sexual intercourse with someone other than the defendant a few days before the alleged occurrence. This testimony was potentially harmful to the State's case against the defendant in that it provided an alternative explanation for the evidence of sexual abuse set forth in Dr. Ahmad's testimony. Since, as the victim's mother stated, she had never mentioned this incident either in prior court proceedings or in the investigation of the case, her testimony would have come as a complete surprise to the State, allowing it no opportunity to gather rebutting evidence. Contrary to the defendant's assertion, then, that the State lacked a legitimate reason for not introducing the rebuttal testimony of witnesses Sandy Ford and Mary Jones during trial, it is evident that its failure to do so resulted not from the State's negligence in investigating and preparing the case but from the defendant's introduction of testimony previously undisclosed by the victim's mother.

We believe, therefore, that sufficient reason existed for allowing the State to reopen its case to present such rebuttal testimony, and we find no abuse of discretion in this regard. (*Cf. People v. DeBoise* (1976), 35 Ill. App. 3d 298, 341 N.E.2d 483 (no abuse of discretion in allowing State to reopen case to rebut defendant's testimony where State not previously aware of rebutting testimony and could not have become so in exercise of due diligence).) The fact, moreover, that the court had taken the case under advisement when the State sought to reopen does not preclude such action by the trial court where sufficient reason was shown to reopen at this time. *Cf. People v. Housby* (1975), 26 Ill. App. 3d 92, 324 N.E.2d 465 (not error for trial court to refuse to open case once jury was close to announcing verdict where there was no indication from defendant as to what evidence and testimony he wished to present).

■ From our review of the record, we find no merit in the defendant's additional assertion that the court's decision to reopen reflected an ongoing bias in favor of the State that existed throughout trial. While the court at one point told the defendant that he would be given "two more minutes" to cross-examine the victim, the court later extended this time to 15 minutes, after which the defendant indicated that there were no further questions. This situation is thus distinguishable from that in *People v. Feathers* (1985), 134 Ill. App. 3d 1060, 481 N.E.2d 826, in which the trial court arbitrarily curtailed cross-examination of the victim in violation of the defendant's right to confront his accuser. The court in the instant case sustained the defendant's objections on a number of occasions and did so frequently during the continuation of the case after the State reopened, while overruling several of the State's objections during the defendant's examination of witnesses. The record fails to demonstrate that the court's decision allowing the State to reopen its case was motivated by bias, and we accordingly reject this contention by the defendant.

■ The defendant next contends that the victim's six-year-old brother was not shown to be competent to testify despite the qualifying questions asked of him by the State before his testimony. In particular, the defendant notes that the State failed to ask the boy if he understood what it means to tell the truth and asserts that the boy's qualifying testimony here established only that he knew of recent childish matters.

The trial court determines a witness' competency to testify, either by making a preliminary inquiry or by observing the witness' demeanor and ability to testify during trial. (*People v. Luigs* (1981), 96 Ill. App. 3d 700, 421 N.E.2d 961.) In light of that court's superior op-

portunity to observe the demeanor of the witness, its determination of competency will not be overturned absent a showing of manifest abuse of discretion. *People v. Garcia* (1983), 97 Ill. 2d 58, 454 N.E.2d 274; *People v. Luigs* (1981), 96 Ill. App. 3d 700, 421 N.E.2d 961.

In the instant case, the victim's brother was questioned at length regarding his present activities and living arrangements as well as his activities of the past summer and Christmas. While the State did not ask him specifically about his understanding of the truth, this omission alone would not render the court's determination of competency erroneous where the court was able to observe the witness' demeanor during rigorous questioning by both the prosecution and the defense. The record demonstrates no abuse of discretion as to the trial court's determination of this witness' competency, and we will not overturn its finding in this regard.

The defendant contends further that it was error to allow certain witnesses to testify as to statements made to them by the victim and her brother. In particular, the defendant cites as error the testimony of Debra Morgan as to what the victim's brother told her about the incident between the victim and the defendant.

By reason of the statutory exception to the hearsay rule for statements made by a victim of a sex offense against a child (Ill. Rev. Stat. 1983, ch. 38, par. 115—10), we find no error in the testimony of witnesses here as to statements made to them by the victim complaining of the incident. To the extent that the testimony of Debra Morgan may have gone beyond the fact that a complaint was made, her testimony of the victim's description of the incident constituted only harmless error where the facts testified to by Ms. Morgan were strongly established by competent testimony of the victim herself. See *In re R.D.* (1985), 131 Ill. App. 3d 612, 476 N.E.2d 62; *In re C.K.M.* (1985), 135 Ill. App. 3d 145, 481 N.E.2d 883.

Although the out-of-court statements of the victim's brother to Debra Morgan would not come within the statutory exception of section 115—10, the defendant waived any objection to this testimony by himself questioning Ms. Morgan on cross-examination regarding Michael's statements to her about the incident. Where a defendant objects to certain testimony on direct examination but then questions the witness on cross-examination concerning the allegedly inadmissible testimony, any error is waived for purposes of appeal. (*People v. Bost* (1980), 80 Ill. App. 3d 933, 400 N.E.2d 734.) The defendant himself, moreover, had earlier initiated the questioning as to Michael's statements about what he had seen in the defendant's cross-examination of the children's grandmother and cannot now challenge similar

testimony elicited by the State as error. (See *People v. Jones* (1983), 119 Ill. App. 3d 615, 456 N.E.2d 926.) Finally, on the record of this case, we cannot see that the defendant was prejudiced by the alleged hearsay testimony regarding out-of-court statements by the victim's brother where the brother was present at trial and was exposed to cross-examination on the matters asserted. (See *People v. Romo* (1980), 85 Ill. App. 3d 886, 407 N.E.2d 661.) We therefore reject this contention of the defendant as lacking in merit.

■■ ■ In the defendant's further argument that he was not proved guilty of the offense of rape beyond a reasonable doubt, the defendant asserts that there was insufficient evidence that the act of sexual intercourse was committed by force and without the victim's consent. (See Ill. Rev. Stat. 1981, ch. 38, par. 11−1.) The record, however, leaves no doubt as to the sufficiency of the evidence on these two elements. The victim herself testified that when "[she] told [the defendant] to stop" during the act of intercourse, he just "kept doing it" and that it was painful. Dr. Ahmad's testimony established that the victim's pain persisted for weeks after the incident to the extent that he could not fully examine her. This evidence of pain, as well as the victim's testimony that she told the defendant to stop, indicates the victim's lack of consent to the act of intercourse.

The evidence also showed that the victim was afraid of the defendant and that she was eight years old and the defendant was 48 at the time of the offense. The defendant tended toward physical violence when angry and had beaten the victim in the past. It appeared further that the defendant held a position of some authority in the household and had secured the loyalty of the victim's mother. The mere fact, therefore, that the victim did what the defendant told her to do during the incident does not demonstrate consent or lack of force. Rather, the respective ages of the victim and the defendant are strong indication to the contrary. (See *People v. Strait* (1983), 116 Ill. App. 3d 110, 451 N.E.2d 631; *People v. Riley* (1967), 84 Ill. App. 2d 296, 228 N.E.2d 190 (proof of actual force not necessary because force is inherent in any act of intercourse with seven-year-old girl, and child of that age is conclusively presumed to be incapable of consenting to act of carnal knowledge); see also *In re Interest of C.K.M.* (1985), 135 Ill. App. 3d 145, 481 N.E.2d 883.) On this record, then, the evidence was sufficient to establish the elements of force and lack of consent necessary for a conviction of rape.

■■ We find similarly that the evidence was sufficient to prove both offenses beyond a reasonable doubt despite the inconsistencies in the victim's testimony cited by the defendant. While offenses of this

nature depending upon the testimony of the victim must be proved by clear and convincing evidence, the victim's testimony need not be perfect as far as memory is concerned in order to be clear and convincing. (*People v. Allison* (1983), 115 Ill. App. 3d 1038, 452 N.E.2d 148.) Here, the victim, who was 10 years old at the time of trial, gave a clear and unambiguous account of the acts constituting the offenses charged. Her testimony was corroborated by the victim's brother who had witnessed the rape and by medical evidence. As to the defendant's testimony denying the incident and the victim's mother's testimony about a prior sexual encounter between the victim and a 14-year-old boy earlier that week, suffice it to say that the credibility of these witnesses was a matter for determination by the trial court. The record supports the trial court's finding of guilt on both offenses, and we accordingly affirm these convictions.

The defendant contends finally that his six-year sentence was excessive and should be reduced or the case sent back for resentencing if his rape conviction is reversed. Since we have found that his rape conviction should stand, it would be inappropriate to reduce his sentence on this basis. While the defendant has had no other criminal convictions, he received the minimum sentence for the crime of rape, and we accordingly decline to reverse this sentence as excessive.

Affirmed.

KASSERMAN, P.J., and KARNS, J., concur.